**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BEVERLY ENTERPRISES–MASSACHUSETTS, INC., d/b/a Beverly Manor Nursing Home, Respondent.**

No. 98–1774.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1999.

Decided April 6, 1999.

Jonathan A. Keselenko, with whom David B. Ellis, Karen L. Vossler, and Foley, Hoag & Eliot, L.L.P., were on brief, for respondent.

Rachel I. Gartner, Senior Attorney, with whom Margaret A. Gaines, Supervisory Attorney, Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, and John D. Burgoyne, Acting Deputy Associate General Counsel, National Labor Relations Board, were on brief, for petitioner.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

BOWNES, Senior Circuit Judge.

The National Labor Relations Board (NLRB or Board) petitioned this court for enforcement of its final order against Beverly Enterprises–Massachusetts, Inc. (Beverly). See 325 NLRB No. 95, 1998 WL 183042 (April 9, 1998). Beverly challenges the Board's order both procedurally and substantively.

Procedurally, the Board incorporated the Administrative Law Judge's (ALJ's) oral bench decision, which was made without affording Beverly an opportunity to submit written briefs. Beverly contends that this procedure, permitted under a recent Board regulation, 29 C.F.R. § 102.42, violates Section 10(c) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 160(c). For this reason, Beverly argues that the regulation is unlawful, arbitrary and capricious. In any event, Beverly contends that the ALJ's procedure failed to comply with the regulation. On this question of first impression in this circuit, we reject Beverly's procedural claims and uphold the regulation.

Substantively, Beverly asserts that the record as a whole does not contain substantial evidence supporting the Board's finding that Beverly violated Sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5), by unilaterally reducing the maximum 1996 wage increase from four percent to three percent, by unlawfully withdrawing recognition from the union representing its employees, and by unilaterally imposing a fee for lost timecards. We conclude that there is such substantial evidence, and enforce the Board's order.

## I. *Background*

### A. *Facts*

The Board found the following facts. Beverly operates a nursing home in Plymouth, Massachusetts. Historically, Beverly had given its employees annual wage increases on the anniversaries of their re-

spective starting dates with the company. At least as early as 1990, Beverly had fixed the maximum wage increase at four percent, and it awarded that amount to approximately ninety percent of its employees.

On March 23, 1993, the NLRB certified the Hospital Workers Union, Local 767, Service Employees International Union (the union), as the exclusive bargaining representative of all full-time and part-time service and maintenance employees at Beverly's Plymouth facility.

Beginning in June 1993, the union and the company engaged in contract negotiations. The parties disagreed as to the amount of wage increases the employees would receive. In October 1994, the union told the company that it would be difficult to persuade its unit members to accept an annual increase of less than four percent. Later in 1994, the union negotiator indicated that the company would have to come up from its three percent figure if the parties were to reach agreement. At the parties' final negotiating session, on December 13, 1995, Beverly responded to the union's earlier proposal of four percent by proposing a two percent annual wage increase. The union expressed shock at the newly lowered offer and did not immediately make a counteroffer. The parties went on to discuss an unrelated dispute (whether certain employees were part of the bargaining unit) and tempers flared. The union spokesperson stated that he needed to check with his attorney on the bargaining unit issue, that he would call the company representative, but that the latter "shouldn't hold [his] breath."

While these negotiations were taking place, Beverly continued to provide its employees with wage increases on their employment anniversaries, and continued to award a maximum wage increase of four percent to the overwhelming majority of them. This practice changed in 1996, however. That year, the company gave to approximately ninety percent of the company's unit employees a maximum wage

increase of three percent. Beverly did not provide notice to the union that it would lower the maximum wage increase from four percent to three percent, nor did Beverly bargain with the union over the issue. Instead, Beverly unilaterally announced the change to the union in a letter, dated March 14, 1996. The letter described the imposition of the three percent maximum wage increase as a "compromise" between the parties' negotiating positions.

In approximately January 1996, Beverly changed its system of keeping track of its employees' work time. It replaced its system of paper timecards with a system using plastic timecards that contained a magnetic strip. Included in its new system was a new policy requiring unit employees to pay a five-dollar fee for lost timecards. In making these changes, Beverly neither gave notice to nor bargained with the union. As of the date of the NLRB hearing on April 15, 1997, the company had collected the five-dollar lost-timecard fee on at least seventeen occasions.

Between January and June 1996, the union contacted Beverly on several occasions and requested that it remedy its unilateral changes and that the parties resume bargaining. In its letters, the union preconditioned further negotiations on Beverly's remedying an unrelated alleged unfair labor practice.

On June 1, 1996, the union's chief negotiator and a group of union members committed a trespass at Beverly's facility while ostensibly handbilling Beverly's employees. On June 17, 1996, the union again wrote Beverly offering to bargain if the latter rectified all outstanding conduct which the union perceived to be violative of the Act. On June 25, 1996, Beverly unilaterally withdrew recognition of the union.

### B. Board Conclusions and Order

The union filed unfair labor practice charges (ULP) with the NLRB. A hearing was held before a Board ALJ, who found the foregoing facts and concluded that

Beverly violated Sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1) and (5) (1994), in two separate respects: by unilaterally reducing the maximum 1996 wage increase from four percent to three percent, and by unilaterally imposing a new fee for lost timecards. The ALJ also found that the company violated the same statutory provisions by unlawfully withdrawing recognition of the union as the exclusive bargaining representative of Beverly's service and maintenance employees. Based upon its findings of fact, the Board adopted both the findings and the recommended decision of its ALJ.

As recommended by the ALJ, the Board ordered Beverly to cease and desist from its unfair labor practices and from otherwise interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the NLRA. Affirmatively, the Board ordered the company immediately to put into effect the annual four percent wage increases that were customary prior to January 1, 1996, and to continue such increases in effect until the company negotiated a collective bargaining agreement (CBA) with the union or reached an impasse after bargaining in good faith. The order also required the company to make whole unit employees for any loss of pay they had suffered due to Beverly's unilateral reduction of the maximum wage increase.

The order further required Beverly to eliminate the five-dollar fee charged to employees for lost timecards until it negotiated a CBA with the union or reached an impasse after bargaining in good faith. It required the company to make whole its unit employees for any losses caused by the imposition of the five-dollar fee. Finally, the order required Beverly to bargain with the union upon request, to embody any understanding reached in a written agreement, and to post an appropriate notice.

## II. *Standard of Review*

■ The applicable standard of review for NLRB action is provided by the National Labor Relations Act, 29 U.S.C. § 160(e) (1994), and, by default, the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). These statutes require us to apply different standards of review depending upon what type of determination we are reviewing.

### A. *The Board's Factual Findings*

■ The Board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477, 71 S.Ct. 456 (internal quotation marks omitted), *quoted in American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 522, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (*ATMI*); *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). The reviewing court must consider "the record in its entirety ..., including the body of evidence opposed to the Board's view." *Universal Camera*, 340 U.S. at 487–88, 71 S.Ct. 456; *see Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 718 (1st Cir.1999). But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *ATMI*, 452 U.S. at 523, 101 S.Ct. 2478 (internal quotation marks omitted).

■ In *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 118 S.Ct. 818, 823, 139 L.Ed.2d 797 (1998), the Court equated the substantial evidence standard with "whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion." The "substantial evidence" test "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact

exists, but merely the degree that *could* satisfy a reasonable factfinder." *Id.* 118 S.Ct. at 828. This is an "objective test," *id.*, so, for example, when the agency "purports to be engaged in simple factfinding, . . . it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands," *id.* at 829; *see Indiana Fed'n of Dentists*, 476 U.S. at 454, 106 S.Ct. 2009.[1] The agency's findings "must . . . be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera*, 340 U.S. at 490, 71 S.Ct. 456.

### B. *The Board's Decisions on Legal Issues.*

■■■■■ Because the NLRA is silent as to the standard for reviewing nonfactual matters, the standard of review for such matters is provided by section 10(e) of the Administrative Procedure Act. Errors of law are reviewed by the court de novo. *See* 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law."); *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 97 n. 7, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983); *Penobscot*, 164 F.3d at 718. "The legal issues presented—that is, the identification of governing legal standards and their application to the facts found—are, by contrast [to factual findings], for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agency's] informed

judgment" in applying statutory terms if the statute is silent or ambiguous on the issue. *Indiana Fed'n of Dentists*, 476 U.S. at 454, 106 S.Ct. 2009.

■■■■■ That deference is described in the familiar two-step test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which applies to the NLRB as to other agencies. "On a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation *must be given effect,* and [agency regulations] must be fully consistent with it." *N.L.R.B. v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (*UFCW*) (emphasis added) (quoting *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 446–48, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Thus, if the legislative intent is clear, we do not defer to the agency and we end the *Chevron* analysis at step one. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778; *Penobscot*, 164 F.3d at 719. We reach the second step of *Chevron* if "the statute is silent or ambiguous with respect to the specific issue"; then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *UFCW*, 484 U.S. at 123, 108 S.Ct. 413 (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). "Under this principle, we have traditionally accorded the Board deference with regard to its interpretation of the NLRA as long as its interpretation is rational and consistent with the statute." *Id.; see also Auciello Iron Works, Inc. v. N.L.R.B.*, 517

---

1. Thus, substantial evidence review is not a rubber stamp. *See Penobscot*, 164 F.3d at 718 n. 2 (quoting *Universal Camera*, 340 U.S. at 490, 71 S.Ct. 456). Indeed, in *Allentown Mack*, the Court found that the Board failed to satisfy this standard, because it refused to credit probative circumstantial evidence, and because it demanded evidence beyond the applicable substantive standard. 118 S.Ct. at 823–24; *see N.L.R.B. v. Baptist Hosp., Inc.*, 442 U.S. 773, 782, 99 S.Ct. 2598, 61 L.Ed.2d

251 (1979); *N.L.R.B. v. LaVerdiere's Enter.*, 933 F.2d 1045, 1050 (1st Cir.1991) ("The courts of appeals are charged with responsibility for the reasonableness and fairness of Labor Board decisions, and a court must set aside Board action when it cannot conscientiously find that the evidence supporting that decision" satisfies the substantial evidence test. (Internal quotation marks and citation omitted)).

U.S. 781, 787–88, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996) (noting "the 'considerable deference' that the Board is due by virtue of its charge to develop national labor policy, through interstitial rulemaking that is 'rational and consistent with the Act' ") (quoting *N.L.R.B. v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786–87, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990)).

■ Even where such deference is due, the agency's "explication" of its reasoning cannot be "inadequate, irrational or arbitrary." *Allentown Mack*, 118 S.Ct. at 822 (internal quotation marks omitted); *see id.* at 826 (The APA "establishes a scheme of reasoned decisionmaking," under which "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (Internal quotation marks omitted)); *Bureau of Alcohol, Tobacco and Firearms*, 464 U.S. at 97, 104 S.Ct. 439 (explaining that reviewing court "must not rubberstamp . . . administrative decisions"). "The reviewing court remains the final authority on issues of statutory construction." *Penobscot*, 164 F.3d at 719 (internal quotation marks omitted); *see* 5 U.S.C. § 706(2)(A).

## C. Review of the Board's Other Action and Conclusions

■ With respect to other agency action, findings, and conclusions, the APA requires the reviewing court to hold them unlawful and set them aside if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Certain agency rules are among the agency actions that may be subjected to the "arbitrary or capricious" standard. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (setting aside an agency rule as "arbitrary and capricious" where agency failed to consider a viable alternative to rescinding its rule, and where agency's reasoning was inadequate in light of the data before it); Kenneth Culp Davis & Richard J. Pierce, Jr., 1 *Administrative Law Treatise* § 7.4 (3d ed.1994).

■ The task of a court reviewing agency action under the APA's "arbitrary or capricious" standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " [2] *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); *see Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted).

■ The reviewing court must "look to see if the agency decision, in the context of the record, is too unreasonable (given its statutory and factual context) for the law to permit it to stand." *Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir.1992) (internal quotation marks omitted).[3]

---

2. The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result, *see Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986), and respond to "relevant" and "significant" public comments. *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35 & n. 58 (D.C.Cir.1977). However, neither requirement is particularly demanding. *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 196–97 (D.C.Cir.1993).

3. The Court has, at times, expressed this standard in a more forgiving way: the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *but see Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting the *Overton Park* standard but recognizing that judicial review would be rendered "generally meaningless" ·

In *State Farm*, the Supreme Court offered several examples of circumstances in which an agency action "normally" would be considered arbitrary and capricious: situations where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. "These are merely 'examples,' *Puerto Rico Sun Oil Co. v. United States E.P.A.*, 8 F.3d 73, 77 (1st Cir.1993); others could be recited as well." *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir.1996). "The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that agency itself has not given." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (citing *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

 "While this is a highly deferential standard of review, it is not a rubber stamp." *Penobscot*, 164 F.3d at 720 (quoting *Dubois*, 102 F.3d at 1285). Although "the ultimate standard of review is a narrow one," the court must undertake "a thorough, probing, in-depth review" and a "searching and careful" inquiry into the record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In order for an agency decision to pass muster under the APA's "arbitrary and capricious" test, the reviewing court must determine that the decision is "rational," *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir.1995), that it "make[s] ... sense," *Puerto Rico Sun Oil*, 8 F.3d at 77. Only by "carefully reviewing the record

unless reviewing court "carefully review[s] the record and satisf[ies itself] that the agency

and satisfying [itself] that the agency has made a reasoned decision" can the court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotation marks omitted).

## III. *Discussion*

### A. *General Principles*

 An employer's duty to bargain with its employees' chosen representatives is an essential element of our national labor policy. "The object of [the NLRA] was ... to insure that employers and their employees could work together to establish mutually satisfactory conditions [of employment]. The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement." *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 498, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979) (quoting *H.K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 103, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970)); *see id.* at 502 n. 14, 99 S.Ct. 1842 (explaining benefits of collective bargaining); *Auciello Iron Works*, 517 U.S. at 785, 116 S.Ct. 1754. The duty to bargain is part and parcel of that policy's preference for resolving labor disputes peacefully, through good faith collective bargaining, rather than by means of industrial strife which has a destructive effect on the economy. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (describing federal labor policy as "to promote industrial stabilization through the collective bargaining agreement"); *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 453–55, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (In passing the NLRA, Congress's purpose was to encourage col-

has made a reasoned decision").

lective bargaining and thereby promote "industrial peace."); *N.L.R.B. v. Lion Oil Co.*, 352 U.S. 282, 289, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957) (The Court has "recognized a dual purpose in the Taft–Hartley Act—to substitute collective bargaining for economic warfare and to protect the right of employees to engage in concerted activities for their own benefit." (internal quotation marks omitted)).

▮ Because of these policy considerations, Section 8(a)(5) of the NLRA, as amplified by Section 8(d), requires an employer to bargain collectively with its employees' representatives over "wages, hours, and other terms and conditions of employment." 29 U.S.C. §§ 158(a)(5), 158(d). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of [its] employees. . . ." 29 U.S.C. § 158(a)(5). That section is also violated if an employer unilaterally changes any term or condition of employment without affording the union representing its employees a meaningful opportunity to negotiate "in fact." *N.L.R.B. v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *see* 29 U.S.C. § 158(a)(5). In addition, "it is generally unlawful for an employer to withdraw recognition of the union as a means of refusing to bargain." *Bolton–Emerson, Inc. v. N.L.R.B.*, 899 F.2d 104, 106 (1st Cir.1990).

B. *The Anniversary Wage Increases*

▮ A pay system in which the employer does not exercise discretion in the timing or the amount of the wage increase awarded is a mandatory subject of bargaining. *See Daily News of Los Angeles*, 315 NLRB 1236, 1239, 1994 WL 731261 (1994), *enforced*, 73 F.3d 406 (D.C.Cir. 1996); *Central Maine Morning Sentinel*, 295 NLRB 376, 378–79, 1989 WL 224140 (1989) ("[T]he exercise of some discretion is not fatal to the conclusion that the raise was a condition of employment."); *Southeastern Michigan Gas Co.*, 198 NLRB 1221, 1222–23, 1972 WL 5110 (1972), *en-*

*forced*, 485 F.2d 1239 (6th Cir.1973). This means, with respect to the anniversary wage increases, that an employer cannot unilaterally change the status quo, as Beverly did here, without bargaining with the union. Even during negotiations, an employer must maintain the "dynamic status quo" pertaining to employees' wages. *Eastern Maine Med. Ctr. v. N.L.R.B.*, 658 F.2d 1, 8 (1st Cir.1981) (In light of longstanding practice of regular wage increases to keep up with inflation and community wage patterns as reflected in periodic wage surveys, an "[i]ndefiniteness as to amount and a flavor of discretion do not . . . prevent the undertaking from becoming part of the conditions of employment."). Thus, "[a]n employer with a past history of a merit increase program [may not] discontinue that program . . . once an exclusive bargaining agent is selected." *Oneita Knitting Mills*, 205 NLRB 500, 500 n. 1, 1973 WL 5149 (1973). Therefore, by unilaterally changing the amount of a fixed wage increase without bargaining with the certified representative of its employees, an employer violates Section 8(a)(5) of the Act. *See Daily News of Los Angeles*, 315 NLRB at 1239; *Southeastern Michigan Gas Co.*, 198 NLRB at 1222–23. In a case with facts very similar to those here, the NLRB held that an employer's unilateral revocation of a company policy granting annual wage increases to keep pace with the wages of its main competitor violated the Act. *See UARCO, Inc.*, 283 NLRB 298, 299–301, 1987 WL 89536 (1987).

Based on the record before it, the Board found that, in implementing a three percent maximum wage increase in 1996, Beverly made a unilateral change to the terms and conditions of employment, in violation of the Act. Beverly does not dispute that, between 1990 and 1995, Beverly gave its employees a four percent maximum wage increase on the anniversaries of their respective dates of employment. Substantial evidence supports the Board's factual finding that, in 1996, without reaching agreement with the union or reaching impasse,

Beverly gave its employees a maximum wage increase of three percent. The Board concluded that the company's system of annual wage increases was a mandatory subject of collective bargaining, and therefore that the company, by unilaterally changing the maximum wage increase awarded, violated Section 8(a)(5) of the Act.

On this issue as on others, the Board's construction of the Act should be upheld if it is "reasonably defensible." *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. 1842. Particularly with respect to determinations that fall within the Board's "special expertise," such as whether an issue is a mandatory subject of bargaining, the Board is entitled to "considerable deference." *Id.* at 495, 99 S.Ct. 1842; *see Auciello Iron Works*, 517 U.S. at 787–88, 116 S.Ct. 1754; *Daily News of Los Angeles v. N.L.R.B.*, 73 F.3d 406, 410–11 (D.C.Cir. 1996) (holding that merit-increase program is a mandatory subject of bargaining). Such is the case here, with respect to the Board's determination.

It does not take much deference to agree that proposed changes to the company's *system* of annual wage increases—in this case, the maximum increase the company will allow—is a mandatory subject of collective bargaining.[4] It is also easy to agree that unilateral changes to that system violate Section 8(a)(5). It is important to our national labor policy that companies not act unilaterally on subjects of mandatory bargaining; doing so defeats the whole purpose of that policy's preference for peaceful negotiation of disputes rather than industrial strife. *See Warrior & Gulf*, 363 U.S. at 578, 80 S.Ct. 1347; *Lion Oil Co.*, 352 U.S. at 289, 77 S.Ct. 330.

Beverly argues that the three percent wage increase in 1996 was not in fact a unilateral change, indeed was not a change at all, but was based on the same formula it had applied in the past when it granted a four percent maximum wage increase. Beverly's witnesses testified that company officials determined the 1996 maximum wage increase exclusively by applying the same "established formula" that the company had used in the past to reach the four percent increase.

Beverly asserts that the ALJ's decision failed to discuss this uncontradicted testimony. But Beverly incorrectly concludes that this means the ALJ "failed to consider" Beverly's testimony. An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make "explicit credibility findings" as to each bit of conflicting testimony, so long as his factual findings as a whole show that he "implicitly resolve[d]" such conflicts. *N.L.R.B. v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir.1982); *see N.L.R.B. v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 765 (2d Cir.1996) (An ALJ may resolve credibility disputes implicitly rather than explicitly where his "treatment of the evidence is supported by the record as a whole.").

Here, the Board "explicitly reject[ed] Beverly's factual contention that the 3 percent maximum increase was the result of its consistent application of an inflexible formula." Instead, the Board placed great weight on the company's March 14, 1996 letter, in which Beverly indicated that the three percent maximum wage increase for 1996 was a "compromise between the [Company's] proposals for 2% anniversary merit increases and the Union's proposals for 4% anniversary merit increases." Even in the face of this admission, Beverly would have the Board accept at face value the self-serving representations of Beverly's Human Resources Director, Jay Begley, that, by some extraordinary coincidence, Beverly's application of its pre-existing formula for calculating wage increases resulted in the same

---

4. The system that the company will apply to all employees is distinguishable from the discretionary application of that system to any individual employee.

3% increase reflected in the "compromise" position.[5] The Board reasonably found that the contemporaneous letter was a "direct explanation" of the company's decision to reduce the maximum wage increase from four to three percent, and "as such constitutes an admission that the 1996 maximum wage increases were not tied to any prior formula used" in past years by the company. Substantial evidence supports this conclusion.

 Beverly argues, in the alternative, that, even if the three percent wage increase did constitute a unilateral change, it did not violate the NLRA because the parties were at impasse and the union "had taken an intractable position." The Board properly rejected this contention as well.

 Before an employer may undertake any unilateral changes, "[t]here is a strong requirement that impasse be clear . . . in order to insure the integrity of the bargaining process." *Bolton–Emerson*, 899 F.2d at 108. This is particularly important because, as noted, our national labor policy prefers peaceful collective bargaining rather than destructive industrial strife. "Impasse occurs when, after good faith bargaining, the parties are deadlocked so that any further bargaining would be futile," *id.*, i.e., when "there [is] no realistic prospect that continuation of discussions at that time would . . . [be] fruitful," *Teamsters Local Union No. 639 v. N.L.R.B.*, 924 F.2d 1078, 1083 (D.C.Cir. 1991) (alteration in original) (internal quotation marks omitted). The law is clear that employer and union representatives must fully pursue bargaining in good faith; they cannot hide behind zealous or even passionate advocacy on the part of their adversaries to short-circuit the collective bargaining process by claiming that the

disfavored point of impasse has been reached. *See N.L.R.B. v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1011–12 (5th Cir. 1990) (stating that small number of substantive bargaining sessions weighs strongly against existence of impasse); *Teamsters Local Union No. 639*, 924 F.2d at 1083–84 (holding that brevity of parties' negotiations on issue and union's position that it still "had more movement to make" undermine employer's declaration of impasse); *N.L.R.B. v. WPIX, Inc.*, 906 F.2d 898, 902 (2d Cir.1990) (concluding that union's dismissal of employer's proposals as "ridiculous" or a "slap in the face" did not constitute conclusive evidence of impasse, recognizing that "exaggeration, posturing and dilatory tactics . . . might be expected in labor negotiations"); *Atlas Tack Corp.*, 226 NLRB 222, 225, 1976 WL 7429 (1976) (no impasse found where there was no indication that "the parties had bargained over a period of time with the result of little or no progress").

 As we have recognized, in determining whether the parties reached good-faith impasse, "the particular facts and complexities of the bargaining process are 'particularly amenable to the expertise of the Board as factfinder.'" *Bolton–Emerson*, 899 F.2d at 108 (quoting *Saunders House v. N.L.R.B.*, 719 F.2d 683, 688 (3d Cir.1983)). Moreover, "few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a Board [that] deals constantly with such problems." *Id.* Substantial evidence supports the Board's finding here that the parties had not reached impasse on the question of wage increases.

As appears from the record, the parties specifically discussed wages at only two

---

5. Beverly's position is like an employer arguing that it could, without violating the NLRA, unilaterally reduce all employees' wages by 25%, without bargaining with the union, because the company's calculation of its costs and profit margins indicated that such a reduction was reasonable in light of its econom-

ic circumstances. The Act focuses not on the economic reasonableness of the resulting wage, but on the process that was followed by the employer and its employees in determining that wage, i.e., whether the wage was the result of a negotiated agreement or the parties negotiated to impasse.

bargaining sessions: a session in October 1994 at which the union representative stated that it would be difficult to persuade its unit members to accept an increase of less than four percent, and the last bargaining session on December 13, 1995, where Beverly's representative, Jay Begley, first proposed a two percent maximum wage increase, leading a union representative to express shock and anger at that proposal, making no counteroffer. At the latter session, the parties went on to argue about an unrelated dispute, tempers flared, and the union representative said he had to check with his attorney about the unrelated matter, that he would call Begley but that the latter "shouldn't hold his breath." Neither party ever presented a final offer on the matter of wage increases.

Beverly relies heavily on the "hold his breath" comment. The company also asserts that the union "withdrew from bargaining for more than six months," that "Beverly received no communication beyond a few, unlawful letters from the Union after December 1995, in the wake of its Director's statement to Begley."

Comparing the instant facts—even the "hold his breath" comment—to those of the precedents cited *supra*, we have no difficulty upholding the Board's finding that the evidence fell far short of establishing that the parties had reached impasse on the question of wages. *See WPIX, Inc.*, 906 F.2d at 902; *Teamsters Local Union No. 639*, 924 F.2d at 1083–84; *Powell Elec. Mfg. Co.*, 906 F.2d at 1011–12. The "hold his breath" comment is similar to the comments that were insufficient to demonstrate impasse in *WPIX, Inc.*, 906 F.2d at 902 (union's comments dismissing employer's proposals as "ridiculous" and a "slap in the face").

Nor does Beverly get any mileage from the union representative's statement that "it would be very difficult for the Union to sell an increase of less than 4 percent to the unit." To say that a proposal "would be difficult . . . to sell" is not the same as a

rigid assertion that the union simply would not be moved from a four percent "bottom line." Nor does it constitute a withdrawal from negotiations unless the company offers four percent, as Beverly asserts; on the contrary, the statement implies a continuing willingness of the party to negotiate, while pointing out one area in which a lot of movement will be "difficult." Indeed, the record contains evidence that the union continued to negotiate, and stated a willingness to continue to negotiate, on a number of occasions after the statement relied upon by Beverly, including several requests, subsequent to the December 1995 bargaining session, that the parties resume negotiations. *See Teamsters*, 924 F.2d at 1083–84.

Moreover, as discussed *infra*, Beverly's characterization of the union's subsequent actions as a withdrawal from bargaining is flawed. Whether or not Beverly liked the union's letters—indeed, whether or not the letters contained some proposals that were inappropriate (such as tying the irrelevant issue of an enlarged bargaining unit to the current negotiations)—the union made it clear in its letters that it desired to continue the collective bargaining process. The parties were a long way from impasse, as the Board and the courts have defined it through their precedents.

For the foregoing reasons, substantial evidence supports the Board's finding that Beverly's reduction of the maximum wage increase was a unilateral change in the terms and conditions of employment, imposed when the parties were not at impasse, and we must uphold the Board's finding that Beverly violated Sections 8(a)(1) and (5) of the Act by unilaterally reducing the maximum wage increase from four percent to three percent.

## C. *The Fee for Lost Timecards*

The second unfair labor practice found by the Board was Beverly's unilateral imposition of a five-dollar charge for lost timecards. The company does not dispute

that it implemented a new policy in January 1996 requiring all employees to pay a five-dollar charge for lost timecards, nor that it undertook this new policy without notice to or bargaining with the union. Beverly characterizes the change as a mere "change to time-clock procedure," and argues that it therefore does not rise to the level of a change in terms and conditions of employment.

But Beverly mischaracterizes the issue: the union did not argue and the Board did not find that Beverly had to bargain with the union about a purely mechanical change to its "time-clock procedure." The Board held that the company's charging of a *fee* to employees for lost timecards—not the procedure that management required workers to follow to record their time— constituted a change in a term or condition of employment, and therefore Beverly's unilateral change in such terms or conditions without first pursuing collective bargaining violated the NLRA. *See N.L.R.B. v. Katz*, 369 U.S. at 743, 82 S.Ct. 1107.

This general principle has been upheld in many different contexts. *See N.L.R.B. v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir.1984) (Breyer, J.) (upholding finding that employer violated Act by unilaterally changing work practices, and rejecting argument that the changes were too minor to have significant effect); *St. Luke's Hosp.*, 314 NLRB 434 (1994) (employer's unilateral change of dress code violated NLRA); *Rangaire Co.*, 309 NLRB 1043 (1992) (unilateral elimination of extra fifteen minutes of lunch break at Thanksgiving violated Act), *enforced without opinion*, 9 F.3d 104 (5th Cir.1993); *Martin Marietta Energy Sys.*, 283 NLRB 173, 1987 WL 89523 (1987) (modification of CBA by adding HMO to existing medical coverage constituted unlawful unilateral change), *enforced without opinion*, 842 F.2d 332 (6th Cir.1988).

■ One of those contexts is remarkably similar to the present case: in *Millard Processing Servs., Inc.*, 310 NLRB 421, 424–25, 1993 WL 37599 (1993), the Board held that an employer violated the NLRA by imposing a fifteen-dollar replacement fee for lost checks. Beverly argues that its imposition of a fee for lost timecards did not violate the Act because the action did not involve a "material, substantial, and significant" change in the terms and conditions of bargaining-unit employees. *See id.; Litton Systems*, 300 NLRB 324, 331, 1990 WL 179692 (1990), *enforced*, 949 F.2d 249 (8th Cir.1991). The Board held in *Millard Processing* that the imposition of a replacement fee qualifies as a "material, substantial, and significant" change in the terms and conditions of employment. 310 NLRB at 424–25. Moreover, the Board's determination that the imposition of a fee for lost timecards is a mandatory subject of bargaining is entitled to considerable deference "because the classification of bargaining subjects as terms or conditions of employment is a matter concerning which the Board has special expertise." *Daily News of Los Angeles*, 73 F.3d at 411 (quoting *Ford Motor Co.*, 441 U.S. at 495, 99 S.Ct. 1842).

Beverly relies on *Rust Craft Broad. of New York, Inc.*, 225 NLRB 327, 1976 WL 7242 (1976), to support its position that the company's changing its timekeeping procedures was within its management prerogative and not a change in terms or conditions of employment that is a mandatory subject of bargaining. Such reliance is misplaced. The employer in *Rust Craft* simply instituted a "change to a mechanical procedure for recording working time," installing time clocks to replace its former system of requiring employees to record their time manually. *Id.* at 327. The company's actions did not impose any new monetary burdens on its employees. But Beverly's actions here did impose such burdens: the employees had to pay five dollars for any lost timecards.

Beverly also argues that the five-dollar charge simply reflected Beverly's passing along its cost to replace a card. But how Beverly derived its five-dollar fee is not the issue. It may be perfectly fair, but the

problem is that the fee constitutes a change in the terms and conditions of employment and Beverly must bargain with the union over such issues, not unilaterally impose them (unless impasse is reached).

The only legitimate question Beverly raises is whether its unilateral change in the terms and conditions of employment is "nominal," so "insignificant" as to be *de minimis*. Put another way, is the size of the replacement fee so small that Beverly could impose it without having to negotiate with the union at all?

We see no reason not to defer to the Board's conclusion that the fee should have been the subject of bargaining before being imposed. Although a five-dollar fee is getting close to the *de minimis* line, we need not decide where that line is. *Cf. Millard Processing*, 310 NLRB at 424–25 (fifteen-dollar fee for replacing lost checks).

■■■ More importantly, our national labor policy prefers employers and employees to bargain collectively over terms and conditions of employment, rather than to take unilateral action that can lead to industrial strife. Under that labor policy, the presumption is in favor of a duty to bargain, and against an exception to that duty on the ground that the unilateral action is allegedly *de minimis*.

D. *Withdrawing Recognition from the Union*

■■■ Beverly also violated the NLRA by withdrawing recognition from the union. There is no dispute that the company withdrew such recognition on June 25, 1996. Beverly argues that it was justified in doing so, based on three independent justifications. We agree with the Board that each of Beverly's contentions is without merit. The same essential reasoning applies in this area as applied with the above-described changes in terms and con-

ditions of employment. The NLRA favors an employer's duty to bargain collectively; the presumption is against the appropriateness of an employer's unilaterally withdrawing recognition from a certified labor organization representing its employees.[6]

■■■ Beverly points first to the union's "unlawful invasion" of company premises on June 1, 1996, as justification for the withdrawal of recognition. On that date, a group of union supporters, including its chief negotiator, entered the nursing home facility and attempted to handbill employees. This arguably constituted an unfair labor practice, as well as a trespass, tortious and/or criminal.

■■■ In extreme circumstances, the Board has withheld otherwise appropriate bargaining orders. Beverly cites two such cases, *N.L.R.B. v. Union Nacional de Trabajadores*, 540 F.2d 1 (1st Cir.1976), and *Laura Modes*, 144 NLRB 1592 (1962). But significantly, in *Trabajadores* and *Laura Modes*, it was *the Board* that applied the sanction, not *the employer* that unilaterally withdrew recognition of the union. Beverly has not cited any cases in which an employer has been allowed unilaterally to withdraw recognition of a union as a form of "self-help" even in response to violent tactics. Moreover, as we have held, even the issuance of a decertification order by the Board "is an extreme measure and should be entered only when the Board has first demonstrated that there are no equally effective alternative means of promoting the objectives of the Act." *Union Nacional de Trabajadores*, 540 F.2d at 13.

There is another reason why Beverly's withdrawal of recognition was unjustified, in addition to the company's engaging in self-help rather than pursuing the statutorily-provided means of filing a complaint with the Board. The conduct in *Trabaja-*

---

6. An exception exists where the employer can show either (1) that the union in ·fact no longer has a majority, or (2) a reasonable good faith doubt of the union's majority status. *See Bolton–Emerson*, 899 F.2d at 106; *Destileria Serrales, Inc. v. N.L.R.B.*, 882 F.2d 19, 20–21 (1st Cir.1989). Beverly does not assert either of these justifications.

*dores, Laura Modes* and similar cases was far more egregious than that of the union here: the union "engaged in violent misconduct so aggravated as to preclude the maintenance of normal collective bargaining relationships." *Trabajadores,* 540 F.2d at 13; *see also Laura Modes,* 144 NLRB at 1596 (finding that the union exhibited "a total disinterest in enforcing its representation rights through the peaceful legal process provided by the Act," and instead "resorted to and/or encouraged the use of violent tactics to compel their grant"). In *Laura Modes,* a union agent and eight non-employee union members entered the employer's plant, struck a management official in the face when he threatened to call the police, and "pushed around" an office employee. A few days later, a union member followed an official of the employer as he left the plant and pointed him out to a group of four men, who beat him up. 144 NLRB at 1594. Similarly, in *Union Nacional de Trabajadores,* 540 F.2d at 6–7, the Board revoked a union's certification where the union president (1) "brutally" assaulted the president of the employer in the presence of employees and (2) threatened employees with serious bodily harm if they continued to work during a union-sponsored strike: "This is Union Nacional and we kill people. So leave." *See also So–Lo Foods, Inc.,* 303 NLRB 749 (1991) (noting that the principle of *Laura Modes* "is only rarely applied to deprive a union of representative rights," is limited to behavior similar to the "repugnant and barbaric" attacks in *Laura Modes,* and even then, the union would not be permanently barred).

The union's trespass in the instant case—with no violence committed or threatened—did not come close to the level of egregiousness that would justify a withdrawal of recognition, even by the Board. We cannot agree with Beverly that one

incident of trespass, with no violence at all, demonstrates *per se* that the "union has abandoned any interest in carrying on collective bargaining on behalf of its members through lawful means and has instead sought to ensure their support through coercion." Resp't Br. at 31. *Cf. N.L.R.B. v. Honaker Mills,* 789 F.2d 262, 267 (4th Cir.1986) ("picket line taunts and jeers" are no defense to a refusal to bargain); *N.L.R.B. v. Triumph Curing Ctr.,* 571 F.2d 462, 476–77 (9th Cir.1978) (withholding of bargaining order not justified, notwithstanding "extremes of verbal abuse and serious threats of physical violence" during first month of protracted strike).

■ Beverly's second argument to justify its unilateral withdrawal of recognition is that the union "had become defunct." But, as the Board found, the record does not reflect the union's inability or unwillingness to perform its representative functions. Beverly relies on one statement by one union representative to one company representative that the latter should not "hold [his] breath" waiting for a response to the company's just-disclosed proposal of a two percent wage increase. But that comment is not a basis for withdrawing recognition. Nor is a six-month break in negotiations, also pointed to by Beverly. *See N.L.R.B. v. Flex Plastics, Inc.,* 726 F.2d 272, 275 (6th Cir.1984) (per curiam) (rejecting argument that union "inaction" was legitimate basis for withdrawal of recognition: "The Company had no evidence that the *Union-employee* relationship was not an active one, only that the Union-management relationship was inactive."); *Pennex Aluminum Corp.,* 288 NLRB 439, 441 (1988) (more than two years since the last negotiating session, but delay was "explained by factors other than loss of employee support"), *enforced without opinion,* 869 F.2d 590 (3d Cir.1989).[7]

---

7. The record does not factually support Beverly's contention that it had a good faith belief that the union had become defunct. During the six months that passed between the last bargaining session and the company's with-

drawal of recognition, the union made several attempts to get negotiations started again. These clearly indicated the union's continuing representational efforts on the part of the bargaining unit. *See N.L.R.B. v. Glover Bot-*

■ Beverly's final justification for its withdrawal of recognition is that the union "placed unlawful conditions" on bargaining, tying further bargaining to unrelated issues such as expanding the bargaining unit and settling an unfair labor practice charge that the union had filed against the company. The union's actions may well have constituted unfair labor practices, and, if the company had filed such complaints with the Board, it is quite possible that the Board would have so held, depending of course on the facts found by the Board. *See Magic Chef, Inc.*, 288 NLRB 2, 10 (1988) (holding that union may not demand, as a condition of signing CBA, that employer agree to settle pending ULP charges). But as the Board (through its ALJ) properly concluded, Beverly is not permitted to withdraw recognition unilaterally "simply because the Union is argued to have violated [the Act] by making a conditional offer to bargain" or otherwise. Such issues are for the Board to resolve; Beverly's self-help is inappropriate.

■ We too have previously recognized that employers are prohibited from withdrawing recognition of a union as a form of "self-help" against a union's unfair labor practices, because "[t]he underlying purpose of this statute is industrial peace." *N.L.R.B. v. U.S. Sonics Corp.*, 312 F.2d 610, 616 (1st Cir.1963) (quoting *Brooks v. N.L.R.B.*, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1954)). We emphasize again that self-help is to be discouraged and collective bargaining encouraged. At most, an employer that believes that a union has committed an unfair labor practice should pursue the neutral process of complaining to the NLRB, rather than engaging in self-help. Self-help on the part of a union is, of course, equally discouraged.

## IV.

The only colorable question raised by Beverly is its argument that the ALJ's

decision was procedurally defective because he chose to dispense with briefs and issue a bench decision.

■ The legality of the Board's decision-making process is a subcategory of legal issues, and will therefore be reviewed *de novo*. *See* 5 U.S.C. § 706.

### A. *Legitimacy of the Regulation*

■ Beverly challenges both the Board's authority to issue the regulation in question, citing Section 10(c) of the Act, 29 U.S.C. § 160(c), and the manner in which it applied the regulation in the instant case. As to the former, Congress authorized the Board "to make such rules and regulations as may be necessary to carry out the provisions of the Act." 29 U.S.C. § 156. This section of the Act affords the Board "broad rulemaking authority," *American Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 613, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991), particularly with respect to rules of procedure, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543–44, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (recognizing the "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure"). Of course, "however sweeping [the] delegation of authority [to an agency], it is not unlimited"; a reviewing court will only sustain regulations where it is "reasonably able to conclude that the grant of authority contemplates the regulations issued," *Planned Parenthood Fed'n, Inc. v. Heckler*, 712 F.2d 650, 655 (D.C.Cir.1983) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 308, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)); *see Kent v. Dulles*, 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), and the regulations are "permissible" under *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

*tled Gas Corp.*, 905 F.2d 681, 686 (2d Cir. 1990) (union's continued activities in representing employees demonstrated that union is not defunct).

■ Beverly is correct that the regulation at issue here reflects a change from the Board's prior procedure, and that such revisions may be entitled to less deference than a position consistently held.

> [A]n administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes. On the other hand, the consistency of an agency's position is a factor in assessing the weight that position is due. As [the Court has] stated: "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). How much weight should be given to the agency's views in such a situation, and in particular where its shifts might have resulted from intervening and possibly erroneous judicial decisions and its current position from one of our own rulings, will depend on the facts of individual cases.

*Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (some internal citations and quotation marks omitted); *see also F.E.C. v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) (observing that "the thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling," but ultimately deferring to inconsistent agency position).

The rule at issue in the instant case is the following:

> Any party shall be entitled, upon request, to a reasonable period at the close of the hearing for oral argument, which may include presentation of proposed findings and conclusions, and shall be included in the stenographic report of the hearing. In the discretion of the administrative law judge, any party may, upon request made before the close of the hearing, file a brief or proposed findings and conclusions, or both, with the administrative law judge, . . . . In any case in which the administrative law judge believes that written briefs or proposed findings of fact and conclusions may not be necessary, he or she shall notify the parties at the opening of the hearing or as soon thereafter as practicable that he or she may wish to hear oral argument in lieu of briefs.

29 C.F.R. § 102.42 (1998).

■ Beverly contends that this regulation cannot stand because the procedure contained therein violates Section 10(c) of the Act, 29 U.S.C. § 160(c). But Section 10(c) cannot bear the weight that Beverly seeks to load upon it. The statute does not entitle parties to an opportunity to file written briefs instead of oral argument; it states that parties "may" file briefs "in [the] discretion [of the ALJ]." [8] 29 U.S.C. § 160(c). The taking of testimony is treated differently than the making of arguments at the close of the testimony. "The *testimony* taken by [the ALJ] shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument." *Id.* (emphasis added).

Thus, Beverly gains nothing by arguing that the regulation "conflicts with Congressional intent as expressed in the Act" because Section 10(c), in Beverly's words, "unambiguously requires the *testimony taken by the ALJ* to be 'reduced to *writing.*'" Resp't Br. at 18 (first emphasis added) (quoting 29 U.S.C. § 160(c)). Bev-

---

**8.** In contrast, the regulation affords parties the right to present oral argument at the close of the hearing, without granting the ALJ any discretion to dispense with that right.

erly does not contend that the ALJ failed to reduce any "testimony" to writing, only that Beverly was not permitted to submit a written brief instead of making an oral argument at the close of all the evidence.

It is true, as Beverly further argues, that the statute goes on to require, where evidence is presented to an ALJ, that the ALJ "shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board." *Id.* But here too, there is nothing to preclude, either implicitly or explicitly, the agency from adopting the procedure permitted in the challenged rule: requiring the ALJ to "certify the accuracy of the pages of the transcript containing the decision" and to cause a copy of those pages to be served on the parties and filed with the Board. 29 C.F.R. § 102.45. In light of the deference due to the Board's interpretation of the Act, we see no reason to disturb the Board's conclusion that "these provisions provide for a written decision, in the form of a certified copy of the record pages containing the judge's full decision, which is served on the parties, in full compliance with the provisions of Section 10(c) of the Act." 59 Fed.Reg. 65,942, 65,944 (Dec. 22, 1994).

■ Beverly also claims that the Board, in adopting that regulation, overruled its long-standing precedent without supplying adequate reasons for doing so. Resp't Br. at 19 (citing *Plumbers, Local 195 (Stone & Webster)*, 237 NLRB 931, 1978 WL 7898 (1978); *Plastic Film Prods. Corp.*, 232 NLRB 722, 1977 WL 9177 (1977)). Beverly argues that the Board acted arbitrarily and capriciously in violation of the APA by amending its regulation, "because [of] the Board's mystifying lack of reasoning in overruling its own precedent in order to justify the Regulation." *Id.* As noted, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(a).

Beverly's inadequate-reasons contention is also without merit, as the Board amply stated its reasons for revising the regulation. The Board stated that it was revising the regulation in order to improve "the role that [Board ALJs] play in facilitating the expeditious resolution of unfair labor practice proceedings." 59 Fed.Reg. 46,375 (Sept. 8, 1994). It offered this regulation as "part of its ongoing review of ways in which unfair labor practice proceedings can be revamped to move the cases more expeditiously." *Id.* at 46,376. Further, the Board addressed the concerns expressed in comments submitted in response to the proposed regulations: the Board stated that the benefits provided through allowing ALJs to issue bench decisions would outweigh the delays that might arise "in the few cases where the procedure is improvidently utilized." *Id.* at 65,943. Additionally, the Board explained that it was consciously overruling the two cases relied on by Beverly, because those cases were "based on a misreading of the requirements of Section 10(c) of the Act." *Id.* at 65,943–44. The Board also pointed to another intervening case where it had upheld an oral decision by a judge. *See Jumbo Produce*, 294 NLRB 998, 998–99, 1989 WL 224192 (1989) (noting that, in *Plumbers, Local 195*, "the judge orally granted the Respondent's motion for summary dismissal stating only that the General Counsel had failed to establish a prima facie case. In contrast, the judge here states on the record his reasons for finding Rivas not to be an agent of the Respondent."), *enforced without opinion*, 931 F.2d 887 (4th Cir. 1991).

We therefore have no difficulty upholding this procedural regulation: it is within the Board's authority and permissible under the Act. The Board considered relevant precedent, discussed the objections raised through the comments submitted, and clearly articulated its reasoning in revising the regulations. Therefore the Board did not act arbitrarily or capriciously in revising the challenged regula-

tion. The question becomes whether the Board complied, as it must, with its own regulation. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (recognizing the right of federal courts to review an agency's actions to ensure that its own regulations have been followed); *Sampson v. Murray,* 415 U.S. 61, 71, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (stating that "federal courts do have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed administrative regulations"); *see also Webster v. Doe,* 486 U.S. 592, 602 n. 7, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).

### B. *Compliance With the Regulation*

Beverly contends that the ALJ's decision to forego written briefs and to issue an oral bench decision violated the NLRB regulation for two reasons: first, the ALJ notified the parties of his decision in an untimely manner, failing to give Beverly adequate notice of his decision to follow that procedure; and second, the circumstances of this case are not appropriate for the invocation of the regulation's oral decision.

The latter issue is easily disposed of. Beverly cites the regulation's statement of circumstances where oral argument in lieu of briefs would be appropriate: "a case that turns on a very straightforward credibility issue; cases involving one-day hearings; cases involving a well-settled legal issue where there is no dispute as to the facts; short record single-issue cases; or cases in which a party defaults by not appearing at the hearing." *See* 59 Fed.Reg. at 46,376. Beverly also finds "significant[ ]" a passage noting "that in more complex cases, *including cases with lengthy records,* these procedures would likely not be appropriate." Resp't Br. at 22 (quoting 59 Fed.Reg. at 65,943). Beverly's argument is unavailing. This two-day hearing is more akin to a "one-day hearing[ ]" than it is to a "case[ ] with [a] lengthy rec-

ord[ ]." Most of the legal issues here are "well-settled," and it became clear as the hearing progressed that the factual disputes evaporated one by one, either nonexistent in the first place or not genuinely contested. While at the outset the case appeared as if it might be "complex," the reality as the evidence came in was that the case presented a few rather straightforward applications of settled principles of labor law. Thus, while initially the ALJ properly left open the possibility that the case might be complex enough to require written briefs, he acted well within his discretion in determining, as the evidence developed, that the case was in fact an appropriate candidate for oral arguments in lieu of briefs.

It must be noted, too, that Beverly is incorrectly trying to limit the Board to the specific circumstances mentioned in the regulation. Those examples were merely illustrative. The Board's Notice of Proposed Rulemaking explicitly stated that "[t]he Board has not tried to spell out, in the proposed rules, the circumstances in which these procedures should be utilized." 59 Fed.Reg. at 46,376. Instead, the Board stated that it would monitor the implementation of the regulation and "refine the circumstances for which the procedures are best suited." *Id.* Thus, while the regulation sets forth "example[s]" of situations in which ALJs might opt to issue bench decisions without briefing, it does not require that such a practice must, or that it may not, be followed in any particular set of circumstances. The regulation explicitly leaves ALJs with discretion in deciding whether written briefs should be permitted or dispensed with, and whether a bench decision should be issued in any given case. The ALJ here exercised his discretion in conformity with the Board's regulation.

We turn to the question of the ALJ's timing in notifying the parties of his discretionary decision. The ALJ notified the parties that he would hear oral argument in lieu of briefs during a recess on the afternoon of the second day of the

hearing. Beverly claims this violates the regulation's requirement that the ALJ "notify the parties at the opening of the hearing or as soon thereafter as practicable." *See* 29 C.F.R. § 102.42. In some cases, no doubt, it will be clear at the outset that written briefs would not be necessary, and the ALJ would therefore have to so notify the parties at the opening of the hearing. In other cases, such as the present one, however, this will not be clear at the outset, and the ALJ will have to hear some evidence in order to get a feel for whether the issues are indeed complex enough to require written briefing, or, alternatively, simple enough for him to exercise his discretion to dispense with such briefing.

After hearing the evidence, the ALJ must notify the parties "as soon ... as practicable" whether he will dispense with briefing. Here, the ALJ heard two days worth of evidence covering each of the three alleged unfair labor practices in question, and decided at that point to dispense with written briefs. The question is whether this was the earliest time that was practicable.

We are concerned about the timing, in that the hearing was all but over when the ALJ notified the parties of his decision. This, on its face, seems contrary to the intent of the regulation requiring notice "at the opening of the hearing or as soon thereafter as practicable." The close of the hearing is as far from the opening as one could get. On the other hand, this timing may be a perfectly reasonable application of the regulation to the circumstances of this case. The union alleged three unfair labor practices, and Beverly contested all three on the facts. Such contested issues could be complex enough to fall outside the boundaries circumscribed by the regulation for oral disposition. But if, after hearing the evidence, it appeared that there were no genuine factual issues in dispute, then the three issues could be reduced to the simple situation contemplated by the regulation—situations involving well-settled legal issues where the facts are not genuinely in dispute—and written briefs would be unnecessary.

We cannot say that the ALJ abused his discretion in so concluding, and in notifying the parties after hearing the bulk of the evidence in the case. We say this with due deference to the expertise in labor matters possessed by the ALJ and the Board that adopted his decision; we also note that the ALJ was the trier of fact who was closest to the evidence and the facts.

Nor did notice at such a late time prejudice Beverly materially. Counsel was given until the following morning before he had to present his closing argument. Such time is considered more than sufficient for attorneys to prepare closing arguments in trials and evidentiary hearings in courts and agencies throughout the country, including hearings lasting substantially more than the two days that was the case here. Moreover, the ALJ, after stating his decision for the record, directly asked both parties whether he had failed to address and resolve any element of the complaint. At that time, Beverly's counsel stated that he did not believe there were any remaining unresolved issues, aside from remedy.

*Conclusion*

The Board's order is *ENFORCED.*