**Armanda C. SOUSA, Plaintiff**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**Civil Action No. 10–11198–WGY.**

United States District Court, D. Massachusetts.

May 9, 2011.

---

Sandra L. Smales, Jamaica Plain, MA, for Plaintiff.

Christine J. Wichers, United States Attorney's Office, Boston, MA, for Defendant.

*MEMORANDUM OF DECISION*

YOUNG, District Judge.

## I. INTRODUCTION

The plaintiff, Armanda C. Sousa ("Sousa"), brings this action pursuant to section

205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Social Security Disability Insurance Benefits. She argues that the Commissioner's decision was not based on substantial evidence because the determination of her residual functional capacity did not include certain limitations on the use of her right arm. She further claims that the hypothetical posed to a vocational expert at the oral hearing on her application did not include all of her relevant limitations. Sousa requests that this Court reverse the decision of the Commissioner.

## A. Procedural Posture

On March 4, 2008, Sousa applied for Social Security Disability Insurance Benefits. Admin. R. 94–102. The Social Security Administration (the "Administration") denied that application on May 9, 2008. *Id.* at 57–59. Upon Sousa's request for reconsideration, the application was again denied on October 2, 2008. *Id.* at 64–66. Sousa then requested a hearing, *id.* at 67–70, which took place on January 28, 2010, *see id.* at 72. The hearing officer issued a decision denying Sousa's application for benefits on February 25, 2010. *Id.* at 4–6. The Administration's Decision Review Board selected Sousa's case for review but failed to complete its review during the allotted time. *Id.* at 1. As a result, the hearing officer's decision became the final decision of the Commissioner. *Id.*

Sousa filed this suit on July 20, 2010, appealing the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). *See* Compl., ECF No. 1. On January 31, 2011, she filed a motion for an order reversing the decision of the Commissioner. ECF No. 11. The Commissioner then filed a motion for an order affirming his decision. ECF No. 14. The Court now addresses these two motions.

## B. Factual Background

Sousa was born in 1963. Admin. R. 28. She has an eighth-grade education and has completed a GED. *Id.* Her past work experience includes jobs as an assembler of badges and rosettes before 1996, as an assembler of chest drainage units from 1997 to 2004, and as a hospital unit assistant from 2004 to 2007. *Id.* at 31–32, 124. She has not worked since November 2007. *Id.* at 123.

### 1. Shoulder Pain

Sousa began suffering from tendinitis in her right rotator cuff in 2003. *Id.* at 293. In May 2003, she sought treatment from Dr. Richard Jaslow ("Dr. Jaslow"), who diagnosed her as having "crepitation on range of motion of the shoulder" and "Type II acromion." *Id.* On follow-up, Dr. Jaslow noted that Sousa's symptoms persisted and opined that they were being caused by the repetitive motions required at her job as an assembler. *Id.* at 292. Because Sousa was not responding to minimally invasive treatments including injections, oral anti-inflammatory medications, and physical therapy, Dr. Jaslow performed exploratory surgery on her right rotator cuff in July 2003, surgically reshaping her acromion. *Id.* at 279, 292. After surgery, Sousa engaged in a work conditioning program and physical therapy. *Id.* at 290. In October 2003, Dr. Jaslow noted that Sousa had full range of motion in her shoulder but did not yet feel at full strength. *Id.* at 289. Dr. Jaslow authorized Sousa to return to work at the end of October 2003. *Id.* In December 2003, Dr. Jaslow noted that Sousa's shoulder was "much better than what it was before her operation" but that she was still experiencing pain. *Id.* He advised her that her shoulder was likely to continue to improve

and that she should follow-up with him again in four weeks. *Id.*

Sousa did not return to see Dr. Jaslow again until July 2007, when she saw him for complaints of neck, back, and shoulder pain. *Id.* at 287. After examination, Dr. Jaslow diagnosed Sousa with rotator cuff tendinitis in both shoulders and mild degenerative disc disease. *Id.* at 288. He advised her that it was important to keep her neck in a neutral position and suggested an exercise program involving stretching and strengthening. *Id.* A follow-up examination showed moderate tenderness of the shoulder with crepitation on active range of motion. *Id.* at 285. Sousa had full range of motion in her cervical spine. Dr. Jaslow injected Sousa's shoulder with Xylocaine and Celestone. *Id.*

In August 2007, Dr. Jaslow referred Sousa to an orthopedist, Dr. Jeremy Stern ("Dr. Stern"), due to continued pain in her right shoulder. *Id.* at 212. Dr. Stern found that Sousa had normal range of motion of her cervical spine and full range of motion in both shoulders. *Id.* An x-ray showed that she had Type II acromion, and he diagnosed her with impingement syndrome. *Id.* Dr. Stern scheduled Sousa for arthroscopic subacromial decompression. *Id.* This decompression surgery took place in November 2007. *Id.* at 208. Ten days after surgery, Dr. Stern examined Sousa and noted that she was "doing very well, [with] minimal discomfort," that she had "excellent mobility," and that "her rotation is normal on external but only to about her belt line on internal." *Id.* at 207. In January 2007, Dr. Stern again examined Sousa and stated that she had "somewhat limited" range of motion and some discomfort, but that her strength and motion were improving. *Id.* at 206. At further examinations in February, April, and June 2008, Dr. Stern recorded that Sousa was still suffering some pain in her shoulder but that she had full range of motion. *Id.* 203–05. In February and April he instructed her not to return to work, and in June opined that he "[did] not think that [Sousa] would be able to do a lot of repetitive work with her arms." *Id.* at 203.

### 2. Back Pain

While Dr. Stern was treating Sousa's shoulder problems, she was simultaneously seeing her primary care physician, Dr. Ann Grady ("Dr. Grady"), for back pain. *See id.* at 236–37. An MRI done in August 2007 showed a small left lateral protrusion at the L4/L5 vertebrae contacting the nerve root and mild degenerative disc disease with mild disc bulge at the L3/L4 vertebrae. *Id.* at 294–95. In October 2007, Sousa was examined by Dr. Angela Simpson ("Dr. Simpson"), who stated that she suffered pain with limited range of motion secondary to stiffness and discomfort, but full range of motion of her lower extremities. *Id.* at 238. Dr. Simpson prescribed a muscle relaxant and encouraged Sousa to lose weight and engage in physical therapy. *Id.*

In November 2007, acting upon a referral from Dr. Grady, Sousa saw Dr. Parakrama M. Ananta ("Dr. Ananta"), a specialist in rehabilitation and physical medicine. *Id.* at 163. Dr. Ananta observed minimal lumbar paraspinal spasm and restricted range of motion in the lumbar and cervical spine, but noted that Sousa had normal muscle strength in her extremities and no significant sensory deficits. *Id.* An MRI showed multilevel degenerative disc disease of the lumbar spine without nerve root compression and a small central disc protrusion without significant nerve root compression. *Id.* at 164. Dr. Ananta diagnosed Sousa with cervical and lumbar degenerative joint disease with mechanical pain; he recommended physical therapy and home exercise programs. *Id.* On fol-

low-up in January 2008, Dr. Ananta found that Sousa had improved range of motion of the lumbar spine and recommended continued physical therapy. *Id.* at 162. At some point, Dr. Ananta also recommended cortisone shots, which Sousa declined. *Id.* at 306.

In August 2009, Sousa was examined by Dr. Shobita Sundar ("Dr. Sundar"), who noted that her motor strength was normal in all extremities. *Id.* at 306–08. Sousa requested a recommendation for a doctor from whom she could receive a second opinion regarding her back pain, and Dr. Sundar gave her a referral. *Id.*

### 3. Urinary Incontinence

In 2008, Sousa was diagnosed with urinary stress incontinence. *Id.* at 213. Dr. Moustafa Ali ("Dr. Ali") performed a surgical transvaginal taping procedure to remedy this diagnosis in June 2008. *Id.*

### 4. Anxiety

Medical records show that Sousa began suffering from anxiety at least as early as November 2005. *Id.* at 229. At that time, her anxiety was noted to be "stable." *Id.* In June 2006, Sousa was unable to sleep, felt her heart beating rapidly, and experienced shortness of breath and chest pains after working a double shift. *Id.* at 230. She was treated at Charlton Memorial Hospital; both an EKG and a chest x-ray were negative, and she was diagnosed with anxiety. *Id.*

In July 2007, Sousa reported to physician's assistant Lynne Bisbano ("Bisbano") that she suffered episodes of anxiety approximately five days per week. *Id.* at 235. Bisbano prescribed Fluoxetine to treat the anxiety. *Id.* Sousa, however, could not tolerate the side effects of the Fluoxetine and ceased taking it. *Id.* at 237. As a result, in August 2007, she was prescribed Citalopram and Xanax to treat her anxiety. *Id.* at 236. In February

2008, Sousa reported increasingly frequent intermittent heart palpitations and stated that she was not taking the prescribed Citalopram daily. *Id.* at 239.

In April 2008, Sousa was evaluated by a psychiatrist, Dr. Robert Cserr ("Dr. Cserr"). *Id.* at 176–78. Sousa reported to Dr. Cserr that she suffered from panic attacks and feelings of being overwhelmed. *Id.* at 176. Dr. Cserr diagnosed Sousa with panic disorder and dysthymic disorder. *Id.* at 178. He noted that her anxiety caused her to be dysfunctional but that she had little trouble with daily activities and was "generally okay" with social interaction. *Id.* at 176. Dr. Cserr gave Sousa a Global Assessment of Functioning score of 60, which reflects moderate symptoms. *Id.* at 178. He stated that he believed more intensive medication management would benefit Sousa. *Id.* at 176.

In July 2008, Sousa returned to her primary care physician, Dr. Grady, complaining of chest pains. *Id.* at 243. Dr. Grady noted that the chest pain could be caused by Sousa's anxiety and increased her dosage of Citalopram. *Id.* In August 2009, Sousa complained about the side effects of Citalopram, but Dr. Grady renewed the prescription. *Id.* at 302–03. Dr. Grady also recommended that Sousa pursue counseling. *Id.* at 303. Sousa began counseling with Barbara Kusinitz in January 2010. *Id.* at 318.

### 5. State Agency Assessments

Sousa was assessed by four non-examining state agency physicians when she applied for disability benefits. Dr. Walter Harrison ("Dr. Harrison") reviewed Sousa's records and completed a physical residual functional capacity assessment in April 2008. *Id.* at 181–88. He opined that Sousa could frequently lift and carry ten pounds and occasionally lift and carry twenty pounds; that she could stand or walk for a total of about six hours with

normal breaks; that she could sit for a total of about six hours with normal breaks; and that she could occasionally climb, kneel, crouch, or crawl. *Id.* at 182–83. He also stated that Sousa had only limited use of her right arm for pushing, pulling, and overhead reaching. *Id.* at 182, 184.

Dr. Marcia Lipski ("Dr. Lipski") reviewed the available evidence and completed a residual functional capacity assessment in September 2008. *Id.* at 271–78. She agreed with Dr. Harrison regarding Sousa's ability to lift and carry loads; sit, stand, and walk for six hours with normal breaks; and occasionally climb, kneel, crouch, or crawl. *Id.* at 272–73. She opined that Sousa could only occasionally reach overhead with her right arm, but that she was unlimited in her ability to push or pull with her right arm. *Id.* at 272, 274. Noting Sousa's history of incontinence, Dr. Lipski stated that Sousa would need access to a bathroom as needed. *Id.* at 272.

Nancy Keuthen, a state agency psychologist, completed a Psychiatric Review Technique in May 2008. *Id.* at 190–202. She opined that Sousa had mild limitations in social functioning, concentration, and daily activities. *Id.* at 200. Based on this, she concluded that Sousa's mental impairments were not severe. *Id.* at 190.

Lastly, Mary Ford Clark ("Clark"), another state agency psychologist, reviewed the record evidence in August 2008. *Id.* at 256–68. She stated that Sousa had no restriction in daily activities but mild limitations in social functioning and concentration. *Id.* at 266. She completed a mental residual functional capacity assessment, stating that Sousa had no limitations in understanding or memory; that she was able to manage simple tasks requiring attention, concentration, persistence, and pace; that she had no limitations with

social demands; and that she was able to manage simple adaptational demands. *Id.* at 254. Clark opined that Sousa was moderately limited in her ability to complete a normal work day. *Id.* at 253.

## II. LEGAL STANDARD

### A. Standard of Review

Under 42 U.S.C. § 405(g), a district court has the power to affirm, modify, or reverse a decision of the Commissioner. The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). The First Circuit has clarified this standard as requiring a court to uphold the Commissioner's findings if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981)). As it is the role of the Commissioner to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence, the Court must not perform such tasks in reviewing the record. *Id.* Complainants face a difficult battle in challenging the Commissioner's determination because, under the substantial evidence standard, the Court must uphold the Commissioner's determination, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987).

## B. Social Security Disability Standard

An individual is considered disabled if she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration has promulgated a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience. *Id.*

The claimant bears the burden in the first four steps to show that she is disabled within the meaning of the Act. *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 7 (1st Cir.1982). Once the claimant has established that she is unable to return to her former employment, the burden shifts to the Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy. *Id.*

## III. THE HEARING OFFICER'S DECISION

The hearing officer applied the five step analysis described above. At the first step, he concluded that Sousa had not engaged in substantial gainful activity since November 2, 2007. Admin. R. 9. At the second step, the hearing officer found that Sousa suffered from three severe impairments: residuals of right shoulder injury, status post two surgeries; lumbosacral degenerative disc disease; and anxiety. *Id.* At the third step, the hearing officer determined that none of these severe impairments, nor their combination, met or medically equaled one of the impairments listed in Appendix 1 of Subpart P of Part 404. *Id.* at 10.

At the fourth step, the hearing officer concluded that Sousa had the residual functional capacity to perform a wide range of light work. *Id.* at 11. She was limited to unskilled work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. *Id.* She could not reach above her head with her right arm and could not perform work that required her to move her right arm behind her back. *Id.* Lastly, she was limited to work that would not require her to change work settings or work processes more than occasionally. *Id.* At the fifth step, based on these findings and upon a hypothetical presented to a vocational expert, the hearing officer found that Sousa could perform her past relevant work as an assembler or could alternatively perform work as a hand packer, production worker, or production inspector, which jobs existed in significant numbers in the Southeastern Massachusetts/Rhode Island economy. *Id.* at 17 & n. 3. Consequently, the hearing officer concluded that Sousa has not been disabled since November 2, 2007. *Id.* at 17.

## IV. ANALYSIS

Sousa challenges the hearing officer's findings at the fourth and fifth steps of the analysis: his determination that she has the residual functional capacity to perform

light work and his finding that she could return to her past job as an assembler.

## A. Residual Functional Capacity

Sousa disputes the hearing officer's finding that she had the residual functional capacity to perform light work subject to several limitations. Specifically, she argues that he failed to include in his finding limitations on her repetitive use of her arms and on her ability to push and pull with her right arm. *See* Mem. Supp. Pl.'s Mot. Reverse Decision Commissioner ("Pl.'s Mem.") 13–14, ECF No. 12.

First, Sousa claims that the hearing officer improperly excluded from her residual functional capacity a limitation on repetitive movements of her arms. She rests this argument on a note by Dr. Stern in his June 2008 evaluation of Sousa: "At this point, I do not think [Sousa] would be able to do a lot of repetitive work with her arms, like washing windows, folding laundry." Admin. R. 203. Sousa asserts that the hearing officer ignored this assessment by Dr. Stern in determining her residual functional capacity.

■ In fact, although the hearing officer did not mention this specific statement by Dr. Stern, he did twice refer to the June 2008 notes containing it. *See id.* at 14, 16. He emphasized Dr. Stern's statements that Sousa "ha[d] done really well," and that her shoulder was "pretty much back where we would expect it to be." *Id.* The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record. *See National Labor Relations Bd. v. Beverly Enterprises–Massachusetts,* 174 F.3d 13, 26 (1st Cir. 1999).

■ Moreover, the hearing officer assigned substantial weight to the opinion of state agency physician Dr. Lipski, whose assessment of Sousa included a review of Dr. Stern's June 2008 notes. *See* Admin. R. 272. Dr. Lipski relied on Dr. Stern's objective statement in his June 2008 notes that Sousa had good range of motion in her shoulder. *See id.* This objective medical evidence properly took precedence over an alleged limitation that seemed to be based on Sousa's subjective complaints. *See id.* at 203 (including in Dr. Stern's notes Sousa's complaint that "[s]he has difficulty doing repetitive movements"). Accordingly, this Court sees no error in the hearing officer's silence regarding this single statement by Dr. Stern and rules that the omission from Sousa's residual functional capacity of a limitation on repetitive use of her arms was supported by substantial evidence.

Second, Sousa claims that the hearing officer improperly failed to include in her residual functional capacity a limitation on her ability to push and pull with her right arm. *See* Pl.'s Mem. 13. This claim relies on a note in the assessment of Dr. Harrison, a state agency physician: "limit push/ pull [right arm]." Admin. R. 182. As above, Sousa argues that the hearing officer ignored Dr. Harrison's assessment. Pl.'s Mem. 13.

The hearing officer actually specifically mentioned Dr. Harrison's opinion as to this limitation in his decision. Admin. R. 15. He then stated that he "generally agree[d]" with Dr. Harrison's assessment and also with that of Dr. Lipski. *Id.* The hearing officer did not, however, include this limitation in his determination, though he included all other limitations identified by Dr. Harrison. *See id.* at 11.

■ The omission of the limitation on the ability to push and pull is supported by substantial evidence. The fact that the hearing officer "generally" agreed with the assessment of Dr. Harrison did not mean that he was required to accept every statement in that assessment. The rejection of

the limitation on pushing and pulling is supported by the fact that Dr. Lipski opined that Sousa was not limited in this respect. *Id.* at 272. Dr. Lipski's evaluation took place after that of Dr. Harrison and included additional medical evidence. The hearing officer's reliance on Dr. Lipski's opinion that Sousa did not have a limitation on the ability to push and pull with her right arm was thus reasonable and supported by substantial evidence.

Accordingly, the Court rules that the hearing officer's findings regarding Sousa's residual functional capacity were supported by substantial evidence; those findings are affirmed.

## B. Vocational Expert Hypothetical

Sousa next argues that the hearing officer failed to include all of her impairments in the hypothetical he presented to the vocational expert at the hearing. *See* Pl.'s Mem. 14. The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis. *See Espada–Rosado v. Comm'r of Soc. Sec.,* 25 Fed.Appx. 5, 6 (1st Cir.2001) (per curiam). In order to be substantial evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations. *See Arocho v. Sec'y of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir.1982); *Musto v. Halter,* 135 F.Supp.2d 220, 232 (D.Mass.2001).

Here, the hearing officer presented to the vocational expert a hypothetical person of Sousa's age, education and work background with a residual functional capacity for unskilled light work with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling; only occasional reaching above her head; no reaching behind her back; and only occasional chang-ing of work setting. Admin. R. 46–47. Based on this hypothetical, the vocational expert opined that Sousa could perform her past work as an assembly worker. *Id.* at 47.

Sousa claims that the hearing officer improperly excluded from the hypothetical limitations on her ability to perform repetitive movements with her arms and on her ability to push and pull with her right arm. *See* Pl.'s Mem. 14. As discussed above, the hearing officer's omission of these limitations from his determination of Sousa's residual functional capacity was supported by substantial evidence. As such, he properly excluded them from the hypothetical presented to the vocational expert.

Sousa also claims that the hearing officer erroneously omitted Sousa's need for breaks from the hypothetical he presented to the vocational expert. *Id.* at 14–15. Sousa claims that she would require breaks throughout the day due to both her urinary incontinence and her anxiety. *Id.* at 15. Even though the hearing officer did not find Sousa's urinary incontinence to be a severe impairment, *see* Admin. R. 9, any limitations from the incontinence ought properly be considered in combination with Sousa's other limitations. *See McDonald v. Sec'y of Health & Human Servs.,* 795 F.2d 1118, 1126 (1st Cir.1986). Here, however, the hearing officer's decision not to include any need for breaks in the hypothetical presented to the vocational expert was supported by substantial evidence.

First, the hearing officer explicitly found that Sousa's urinary incontinence was not severe and did not impose any vocationally relevant limitations. *See* Admin. R. 10, 17 n. 3. Sousa seems to challenge this finding based on Dr. Lipski's opinion that Sousa would require bathroom breaks as needed. *Id.* at 272. That opinion was based on

medical notes from June 2008. *Id.* In June 2008, however, Dr. Ali performed surgery on Sousa to fix her urinary incontinence. *Id.* at 213. There is no medical evidence in the record that the urinary incontinence continued after that procedure. Thus, the hearing officer's decision not to include a limitation concerning Sousa's claimed need for additional bathroom breaks was supported by substantial evidence.[1]

■ Second, the hearing officer noted Clark's opinion that Sousa was moderately limited in her ability to complete a normal work day because of her anxiety, but emphasized that Clark also stated that Sousa "would be able to manage simple tasks and simple adaptational demands." *Id.* at 16. Based on Sousa's psychological limitation, the hearing officer limited her to unskilled work that would require only occasional changes in work setting or work processes. *See id.* at 11, 16; *see also id.* at 47 (including these limitations in hypothetical presented to vocational expert). Sousa disputes this, claiming that the hearing officer also should have included a limitation that Sousa would face potential psychological interruptions to a normal work day and work week. Pl.'s Mem. 15. There is no evidence that would support, much less require, such a limitation. Other than Clark's opinion that she was moderately limited in her ability to complete a normal work day and work week, psychological evaluations of Sousa found only mild limitations and generally found Sousa capable of carrying out simple tasks. *See* Admin. R. 190–202, 256–68. Moreover, Sousa identifies no statements by any of the doctors who treated her anxiety that she would be unable to complete a normal work day without psychological interruption. Thus, the hearing officer's exclusion from the hypothetical of a limitation that Sousa may suffer potential psychological interruptions to the work day was supported by substantial evidence.

Accordingly, this Court rules that the hypothetical upon which the vocational expert based his opinion accurately reflected the hearing officer's determination of Sousa's vocationally relevant limitations. This determination was supported by substantial evidence and is affirmed.

## V. CONCLUSION

For all the reasons stated above, this Court DENIES Sousa's motion to reverse, ECF No. 11, and GRANTS the Commissioner's motion for an order affirming his decision, ECF No. 14. Judgment shall enter for the Commissioner.

SO ORDERED.

---

1. In her memorandum, Sousa relies on statements by the vocational expert that fewer jobs would be available to her if she required two unscheduled bathroom breaks per day and that no jobs would be available if she required four unscheduled bathroom breaks per day. *See* Pl.'s Mem. 14–15. She offered no medical evidence supporting these two alternative hypotheticals. Even Dr. Lipski merely opined that Sousa would need bathroom breaks as needed, and there is no evidence that such a requirement could not be met by the three normal breaks during an eight-hour work day.