**Kaijia Malana TRAYNHAM, Plaintiff**

v.

**Michael J. ASTRUE, Commissioner, Social Security Administration, Defendant.**

**C.A. No. 11–cv–30246–MAP.**

United States District Court, D. Massachusetts.

Feb. 25, 2013.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

Thomas D. Ramsey, Office of the General Counsel, Social Security Administration, Boston, MA, for Interested Party.

Peter P. Slepchuk, Jr., Law Office of Peter P. Slepchuk Jr., Springfield, MA, for Plaintiff.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER REVERSING DECISION OF COMMISSIONER AND DEFENDANT'S MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER* (Dkt. Nos. 8 & 16)

PONSOR, District Judge.

## I. INTRODUCTION

This action seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for Social Security disability insurance benefits. Plaintiff applied for a period of disability, disability insurance benefits, and supplemental security income on May 24, 2007, and May 4, 2009, respectively,[1] alleging disability for chronic pain, back disorders, and affective disorders. (A.R. 188–97, 199–205.) After a hearing on May 3, 2011, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied Plaintiff's claim. (A.R. 45–60.) The Appeals Council denied the Plaintiff's request for review on September 13, 2011, rendering the hearing decision final and subject to judicial review. (A.R. 1–4.) Plaintiff filed this complaint on November 7, 2011.

Plaintiff now moves for an order reversing the decision of the Commissioner (Dkt. No. 8), and Defendant moves for an order affirming the decision of the Commissioner (Dkt. No. 16). For the reasons stated below, Plaintiff's motion will be allowed, and Defendant's motion will be denied.

## II. FACTS

At the time of the ALJ's decision, Plaintiff was forty-five years old. She had completed tenth grade, obtained a general equivalency degree, and completed job training leading to a Certified Nurse's Aide certificate. She had previously worked as a dialysis assistant, patient care technician, and certified nurse's aide. (A.R. 13–15, 250.)

### A. Physical Conditions.

Plaintiff testified that her back pain began after she was involved in a motor vehicle accident in 1999. (A.R. 30, 51.) Plaintiff underwent a left posterior C5–C6 minimally-invasive microdisectomy in March 2003 to treat cervical disc disease. (A.R. 376, 465.)

Late in the night of March 3, 2004, Plaintiff was accosted by an assailant who stole her purse and punched her in the face and head. The next morning, she went to the emergency room at Baystate Medical Center. (A.R. 376–78.) She reported severe generalized headache, double and blurry vision, severe photophobia in the right eye, diffuse facial pain, some tingling in her left hand, and diffuse neck pain with a radiation of pain into the left upper extremity, consistent with symptoms from the previous year that had required surgery. (A.R. 376.) The physicians diagnosed multiple facial contusions, neck strain, and radiculopathy of the upper left extremity. (A.R. 377.) A computed tomography ("CT") scan of the brain revealed a moderate amount of brain atro-

---

**1.** Her claims were assigned a protective filing date of May 17, 2007. (A.R. 45, 241.) A protective filing date is provided under certain circumstances when an applicant makes an oral or written inquiry about applying for disability benefits prior to submitting an application. 20 C.F.R. §§ 416.340–416.350.

phy for Plaintiff's age. (A.R. 377, 380.) A CT scan of the facial bones revealed a right medial orbital wall fracture and right-sided nasal bone fracture. (A.R. 377, 381.) The consulting ophthalmologist stated that Plaintiff probably had traumatic iritis. (A.R. 377.)

Plaintiff was treated in 2005 and 2006 for complaints of chest pain, bilateral shoulder and arm pain, and recurring low back pain. (A.R. 346–47, 349–50, 356–58, 360–62.) She was diagnosed with a viral upper respiratory tract infection (A.R. 356–57), sciatica and elevated blood pressure (A.R. 347, 349), and cervical radiculopathy due to degenerative changes (A.R. 353–54).

On August 27, 2008, Plaintiff was seen at the Caring Health Center for complaints of neck pain radiating into her left arm. Examination revealed limited neck movement with tingling of her left arm and numbness in her fingers. (A.R. 399.) Magnetic resonance imaging ("MRI") of the cervical spine on September 5, 2008, revealed multilevel degenerative disc changes as well as a reversal of the cervical lordosis.[2]

In February 2009, she was evaluated by Dr. Christopher Comey at New England Neurosurgical Associates, LLC, due to increasing left-sided neck and arm pain as well as diffuse weakness in the left arm. (A.R. 465–66.) Imaging revealed an acute left C5–C6 disc herniation. The physical examination by Dr. Comey revealed mild diffuse weakness in the left upper extremity. Her examination was limited due to pain. (A.R. 52, 465.)

On April 22, 2009, Plaintiff returned for another evaluation by Dr. Comey. Dr. Comey reviewed the CT scan of the cervical spine that was done in March 2009. He noted severe degenerative changes with reversal of her cervical lordosis at C4–C5, C5–C6, and C6–C7. Again, this examination was limited due to Plaintiff's pain. Dr. Comey recommended that, if the pain was severe and incapacitating, Plaintiff should undergo an anterior diskectomy and fusion. (A.R. 464.) Plaintiff did not want to consider surgery for fear that she would not be able to move her neck again. (A.R. 464, 467, 470, 523.) For that reason, Dr. Comey recommended that Plaintiff be evaluated for a trial of injection therapy. (A.R. 464.)

Plaintiff was treated by two primary care physicians in 2009 and 2010 for her chronic pain. At Baystate Health, Dr. Abdulrahman Alkabbani, M.D., treated Plaintiff for chronic pain three times in 2009 and 2010. Plaintiff also went to the emergency room at Baystate Health in November 2009 complaining of low back pain.

In October 2010, Dr. Martin Bem became Plaintiff's primary care physician. Dr. Bem referred Plaintiff to two specialists: Dr. Raghu Bajwa, M.D. and Dr. Douglas Molin, M.D. at Pioneer Spine and Sports Physicians PC. (A.R. 554–55.) Dr. Bajwa evaluated Plaintiff for neck pain that radiated into her left arm and lower back pain. Dr. Bajwa noted that Plaintiff was in "mild distress," her left shoulder motion was limited, and her shoulder was positive for tenderness. Dr. Bajwa recommended physical therapy. Dr. Molin evaluated claimant based on her complaints of pain in her neck, lower back, left arm, and left leg. (A.R. 558.) Dr. Molin noted that Plaintiff's left arm was "so painful I could not move it." Dr. Molin diagnosed Plain-

---

**2.** Cervical lordosis: the normal, anteriorly convex curvature of the cervical segment of the vertebral column; cervical lordosis is a secondary curvature of the vertebral column, acquired postnatally as the infant lifts its head. *Stedman's Medical Dictionary* (27th ed.2000).

tiff with postlaminectomy syndrome cervical region, chronic pain syndrome, tobacco disorder, and pain in limb. (A.R. 559–60.)

Dr. Bem also treated Plaintiff three times between October 2010 and January 2011 for her neck and back pain. (A.R. 567–76.) Dr. Bem noted that Plaintiff had multiple medical problems: anxiety, depression, insomnia, chronic low back pain, chronic neck pain syndrome, high blood pressure, hypertension, chronic pain syndrome, smoker, and sciatica. (A.R. 575.)

In December 2010, Plaintiff presented to the emergency room at Mercy Medical Center with complaints of back pain, rated ten out of ten on a pain scale. (A.R. 542.) Her exam was positive for back pain and the physician noted that she was tearful and in pain. (A.R. 548–49.) Plaintiff was diagnosed with acute lumbar spasm. (A.R. 550.)

### B. Mental Conditions.

Plaintiff also suffered from well-documented depression. On August 18, 2008, she presented at Liberty Street Counseling Services and underwent an initial psychological evaluation. (A.R. 382–96.) Plaintiff reported that she was self-medicating with alcohol and had panic attacks when she tried to sleep. (A.R. 382–83.) The interviewing clinician, David Hamilton, reported that, while Plaintiff was cooperative, she was also disheveled, tense, depressed, sad, and restless. He also noted that her thought process was unremarkable, her speech was appropriate, and her intellectual functioning was average. However, she displayed a short attention span and impaired recent and remote memory. (A.R. 387–89.) She was diag-nosed with major depressive disorder, recurrent; alcohol abuse; and panic disorder without agoraphobia. (A.R. 391–392.) The clinician assigned a Global Assessment of Functioning ("GAF") score of 45.[3] (A.R. 392.)

Plaintiff attended ten treatment sessions at Liberty Street Counseling Services but was discharged when she ended services without notice. (A.R. 462.) Plaintiff was never given a GAF score above 45 while attending treatment. (A.R. 462–63.) Plaintiff testified that she ended treatment because it was not helping her condition. (A.R. 19, 483.)

### C. State Agency Opinions: Physical Capacity.

On October 16, 2008, Dr. Leslie Caraceni, M.D., a non-examining medical consultant for the Massachusetts Disability Determination Services ("DDS"), assessed Plaintiff's physical residual functional capacity based solely on her medical records. (A.R. 404–11.) Dr. Caraceni found that Plaintiff could stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (A.R. 405.) Dr. Caraceni noted that Plaintiff had limited reaching ability due to neck pain but should have unlimited handling, fingering, and feeling ability. (A.R. 407.) According to Dr. Caraceni's report, Plaintiff's symptoms were attributable to a medically determinable impairment, the severity and duration of her symptoms as reported by Plaintiff were credible, and her symptoms's effect on function was consistent with the medical and non-medical evidence. (A.R. 409.) On October 6, 2009, Dr. Elaine Hom, M.D., another DDS medi-

3. The GAF scale provides a means for measuring psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. A score between 41 and 50 denotes serious symptoms or serious impairment in social, occupational, or school functioning. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (2002).

cal consultant, affirmed Dr. Caraceni's findings. (A.R. 482.)

On April 5, 2010, Dr. Abdulrahman Al-kabbani, M.D., Plaintiff's primary care treating physician, completed a *Department of Transitional Assistance and Disability Evaluation Services Form.* (A.R. 525–530.) Dr. Alkabbani diagnosed Plaintiff with chronic back pain and cervical disc herniation, the treatment for both consisting of physical therapy and pain medication. (A.R. 528.) He stated that Plaintiff had an impairment affecting her ability to work, which was expected to last more than a year. (A.R. 530.)

On February 3, 2011, Dr. Martin Bem, Plaintiff's successor primary care treating physician, completed a *Physical Residual Functional Capacity Questionnaire.* (A.R. 579–83.) Dr. Bem reported that Plaintiff suffered from anxiousness, dizziness, pain in her neck radiating into both shoulders, and pain in her back radiating into her legs. He noted that Plaintiff's medications made her drowsy and less attentive. (A.R. 579.) Dr. Bem opined that Plaintiff's impairments were expected to last more than twelve months and that the symptoms were severe enough to constantly interfere with the level of attention and concentration she would need to perform simple work tasks. (A.R. 579–80.) Dr. Bem noted that Plaintiff would be unable to sit for 10 minutes or stand for 15 minutes at a time; and, in an eight-hour day, Plaintiff could sit or stand for less than two hours. (A.R. 580–81.) He noted several times on the form that Plaintiff was unable to work. (A.R. 581.)

D. *State Agency Opinions: Mental Health.*

On December 3, 2008, Dr. Robert Dean, Ph.D., a DDS mental health consultant, completed a consultative examination on Plaintiff. Dr. Dean examined Plaintiff's intellectual ability and performed an in-person psychodiagnostic interview. (A.R. 413–18.) Dr. Dean reported that Plaintiff was slow moving "as if she were elderly or somewhat physically compromised, but otherwise ..., without any apparent sign of physical disability or impairment." (A.R. 413.) Dr. Dean found that, while Plaintiff's thought processes were logical, coherent, relevant, and without any bizarre or peculiar content, she seemed to be of low-average intellectual ability. (A.R. 413.) Plaintiff's scores on an intelligence test indicated that she was in the "borderline intellectual functioning category." Dr. Dean opined that the test scores might underestimate her abilities, but that her chronic and generalized depression contributed to a lack of effort in testing. (A.R. 414.) Dr. Dean also noted that Plaintiff's arithmetic calculation skills were an area of significant weakness. (A.R. 415.) Dr. Dean found that Plaintiff would not be able to manage her funds at that time as she was abusing alcohol. (A.R. 417.) Dr. Dean diagnosed Plaintiff with alcohol dependence, continuous; cocaine abuse/dependence, remission; depressive disorder; and risk of mathematics disorder. (A.R. 418.)

On January 17, 2009, Dr. Brian O'Sullivan, Ph.D., a non-examining consultative mental health specialist for DDS, reviewed Plaintiff's mental functional capacities based solely on her medical records. (A.R. 419–36.) Dr. O'Sullivan found that Plaintiff was limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to perform activities within a schedule. (A.R. 419.) He found that Plaintiff was not limited in other respects, such as understanding and memory, concentration and persistence, maintaining social interaction, and having the ability to adapt.

(A.R. 419–20.) He noted that Plaintiff could "keep average pace for simple routine directions over a regular full time routine but variable energy and concentration due to depression and [substance abuse disorder] could slow detailed tasks and might limit punctuality for early morning shift starts." (A.R. 421.)

On October 27, 2009, Dr. Robert Sampson, M.D., examined Plaintiff for the sole purpose of Social Security Evaluation. (A.R. 483–88.) Dr. Sampson reported that Plaintiff was of low average intelligence and had difficulty with subtraction problems but that she was oriented and could abstract similarities well. Dr. Sampson noted that her depression was related to the chronic neck and left arm pain that Plaintiff experienced. (A.R. 486.) He recommended treatment for her depression in conjunction with a pain treatment program. (A.R. 487.) Plaintiff was given a GAF score of 52.

On August 13, 2010, Dr. Victor Carbone, Ph.D., a state agency mental health consultant, examined Plaintiff. (A.R. 531–533.) He concluded that she was of average intelligence but appeared to be in pain, had depressed mood, and somewhat delayed speech. (A.R. 532–533.) He concluded that Plaintiff was a "[p]atient with history of significant pain and a history of severe abuse who continues to struggle and is not currently in treatment." (A.R. 533.) She was assigned a GAF score of 54. (A.R. 533.)

### E. *Plaintiff's Testimony.*

In the hearing before the ALJ, Plaintiff testified that she was unable to work due to pain. (A.R. 15.) She reported pain in her left arm that went to her fingers and included numbness and tingling and in her lower back that went down her right leg and included muscle spasms. (A.R. 15–16, 30.) She stated that her concentration was limited, and her prescribed medicines made her dizzy and drowsy. (A.R. 20–26.) She stated that she could not stand for an extended period, could not sit for more than twenty minutes at a time, and could not walk for any distance. (A.R. 21–22, 28.) She said that she was unable to do anything on a consistent schedule because she experienced chronic pain on a regular basis. She also testified that she felt constantly fatigued due to depression, had memory problems, and was easily confused. (A.R. 30–32.)

### F. *ALJ's Findings.*

At Step One of the disability adjudicative process, the ALJ found that Plaintiff had engaged in substantial gainful activity between December 2006 through December 2007. The ALJ found that Plaintiff failed to meet her burden of proof to overcome that the presumption that the work qualified as substantial gainful activity, and therefore Plaintiff's earnings between the onset date and December 31, 2007 disqualified her for benefits during that period. However, the ALJ found that there had been a continuous twelve-month period where Plaintiff did not engage in substantial gainful activity since December 31, 2007, when she might qualify for benefits.

At Step Two, the ALJ found that Plaintiff's degenerative disc disease to the cervical spine, left upper extremity radiculopathy, chronic back pain, depressive disorder, and polysubstance abuse disorder were severe impairments. (A.R. 47–48.) At Step Three, the ALJ determined that Plaintiff's impairments did not meet or medically equal any listed impairments. (A.R. 49.) The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except:

she would be limited to simple and un-skilled tasks. The claimant's work should not be performed at heights or with ropes, ladders, or scaffolding. The claimant's work should not entail over-head reaching and lifting. The claimant would be limited to no more than occa-sional climbing ramps or stairs, stoop-ing, crouching, crawling, or kneeling. She would be limited to no more than occasional grasping, pinching, and twist-ing with her non-dominant left hand and arm. The claimant's work should be outside (sic) and have no more than incidental exposure to the cold and vi-brations. The claimant's work should not involve the operation of right foot or leg controls. The claimant's work should entail lifting no more than five pounds with her left hand and arm.

(A.R. 50.) Based on this RFC, at Step Four, the ALJ 15 determined that Plaintiff was not capable of performing any past relevant work. (A.R. 58.) However, the ALJ found that there were jobs that exist-ed in significant numbers in the national economy that Plaintiff could perform. (A.R. 59.) The ALJ concluded that Plaintiff was not disabled. (A.R. 60.)

### III. DISCUSSION

Plaintiff argues that the ALJ's RFC as-sessment was not supported by substantial evidence for the following reasons: (1) the ALJ did not properly apply the so-called "Avery Factors," relating to the assess-ment of subjectively-reported symptoms such as pain; (2) the ALJ failed to proper-ly weigh medical opinions, especially those from Plaintiff's treating primary care phy-sicians; and (3) the ALJ improperly ana-lyzed and relied upon the Vocational Ex-pert's testimony.

A review of the record confirms that the ALJ did not properly apply the Avery Factors, did not give proper weight to Plaintiff's treating and consultative physi-cians, and did not properly analyze the opinion of the vocational expert. The case will be remanded to the ALJ for reconsid-eration consistent with this decision.

### A. Standard of Review.

Judicial review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision and (2) whether the Commissioner applied the correct legal standards. Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir.2001). The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Com-missioner and his designee, the ALJ. See id. at 10. The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is such evi-dence "as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Ac-cordingly, the court must affirm the Com-missioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to sup-port his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.1981). The court's obligation to affirm a substantially supported finding holds true "even if the record arguably could justify a different conclusion." Rod-riguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir.1987) (per curiam).

### B. Avery Factors.

Plaintiff first argues that the ALJ erred by not properly applying the Avery factors to her subjective complaints about her pain and limitations. The ALJ found that Plaintiff was not "entirely credible" as to her limitations due to inconsistent reports

of her pain and a lack of correlation between her allegations and the medical evidence. (A.R. 58.)

Under *Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 23 (1st Cir.1986), an ALJ should consider the following factors in assessing a claimant's asserted subjective symptoms such as pain:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.* lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Not every factor must be considered. *NLRB v. Beverly Enters–Mass. Inc.*, 174 F.3d 13, 26 (1st Cir.1999). Rather, the ALJ's explanation for finding a claimant less than fully credible need only be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." SSR 96–7p; *Foley v. Astrue,* No. 09–10864, 2010 WL 2507773 at *7 (D.Mass. Jun. 17, 2010).

As evidence of Plaintiff's ability to function with her pain, the ALJ relied on three main factors: (1) her daily living and social activities; (2) her sporadic treatment and decision not to have surgery; and (3) inconsistencies in the medical record as to the severity of Plaintiff's pain. A review of the record demonstrates that the ALJ's assessment of these factors was not adequately supported by the evidence.

First, the ALJ noted that Plaintiff was capable of preparing meals, washing dishes, shopping, managing her finances, and interacting with other people either on the phone or in person. (A.R. 51.) However, Plaintiff had actually reported severe limitations in her abilities to manage daily living. Plaintiff reported that she could only prepare simple meals and did so only once or twice a week. (A.R. 265–66.) The only household chore that she could perform, approximately two times per week, was washing the dishes. (A.R. 266.) She reported that she shopped for food once per month. (A.R. 267.) Both Plaintiff and her sister reported that the sister assisted Plaintiff with the shopping, dressing, and cleaning. (A.R. 20–21, 31, 288, 306, 532–33.) While Plaintiff frequently talked to her sister, she also testified that two to four days a week she was unable to get out of bed due to pain, and even on her good days, she needed to lie down two times for over an hour because of pain. (A.R. 25, 29–30, 264, 277, 485.)

Second, the ALJ found that Plaintiff lacked credibility because she refused to undergo recommended surgery which "suggests her symptoms are not severe or incapacitating." (A.R. 58.) While Plaintiff did refuse a second surgery recommended by Dr. Comey, Plaintiff consistently expressed concern that the surgery would result in a loss of mobility in her neck. (A.R. 464, 467, 470, 523.) Plaintiff's fear stemmed in large part from the fact that

her previous surgery had been unsuccessful and made her symptoms worse. Plaintiff was evaluated for Dr. Comey's alternative treatment, trial injections. (A.R. 558–60.)

The ALJ also noted that the majority of Plaintiff's treatments for her physical impairments occurred in 2009 with only intermittent treatment prior to or after 2009. The ALJ found that the limited treatment "suggests that the symptoms may not have been as serious as has been alleged." (A.R. 58.) It is true that most of the medical records come from 2008 or later. However, the ALJ also assigned Plaintiff an onset date of December 31, 2007, because she had substantial gainful activity before that point in time. Since December 31, 2007, Plaintiff has been regularly receiving treatment for her physical impairments through emergency room visits and examinations by her primary care providers and consultants at Baystate High Street Health Center, Comprehensive Family Medical Care, Physical Medicine and Rehabilitation, and Pioneer Spine and Sports Physicians. (*See* Dkt. No. 6–1, List of Exhibits.)

Finally, the ALJ found that Plaintiff's "extreme symptoms of pain and limitations that she reports" were not supported by the "objective findings." (A.R. 58.) The ALJ noted that several doctors had reported that during evaluations, Plaintiff "appeared to be in no distress, cooperative, and alert and had a normal gait." (A.R. 58 (internal citation omitted).) Significantly, the parts of the record that the ALJ cited were observations that were not part of the actual examinations but observations simply noted on the chart. Moreover, the ALJ failed to address how Plaintiff's depression or medication affected her demeanor. In his intelligence capacity assessment, Dr. Dean noted that "her apparently chronic and generalized depression probably contributed to a lack of energetic, persistent effort in testing." (A.R. 414.) Plaintiff also testified that her medication made her drowsy all of the time and dizzy. (A.R. 20.) These side effects were confirmed in Dr. Bem's assessment in the Physical Residual Functional Capacity Questionnaire. He noted that her medications "will make her drowsy, less attentive." (A.R. 579.)

In fact, Plaintiff's medical records demonstrated that the doctors who examined her gave credence to her pain. During examinations, her doctors reported that her neck and shoulder movements were limited by pain and that she could not stand straight. (A.R. 399, 470–71, 512, 522.) On one occasion, the chart noted that her general appearance was that she was in "lots of pain," "in tears." (A.R. 522.) Plaintiff's two examinations with Dr. Comey were also limited due to her pain. (A.R. 464–66.) When Dr. Raghu Bajwa, M.D., saw Plaintiff in December 2010, he reported "mild distress," a limited range of motion in her left shoulder, and tenderness in her paraspinal muscles and left shoulder. (A.R. 556–57.) Finally in December 2010, Dr. Molin reported that while Plaintiff was responsive and cooperative she did not move her left upper extremity because of pain and that her sensation in that side was diminished. He also noted that "her left arm was so painful that I would not move it." (A.R. 558–60.)

The reasons that the ALJ gives for discounting Plaintiff's credibility and her subjective assessment of pain are not supported on the record. A more detailed examination of the records reveal additional support for Plaintiff's limitations and pain assessments.

## C. *Weight of the Medical Evidence.*

██ Plaintiff argues that the ALJ erred by placing greater weight on non-treating

sources than on treating sources. Reports from non-examining physicians that "contain little more than brief conclusory statements or the mere checking of boxes . . . are entitled to relatively little weight." *Berrios Lopez v. Sec'y of Health and Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991).

The ALJ is generally required to give more weight to the opinions of treating physicians than to other medical opinions. 20 C.F.R. § 404.1527(d)(2). The ALJ should give controlling weight to treating physicians' opinions if the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record. *Id.*

■ The ALJ assigned "significant weight" to the opinion of Dr. Dean and "great weight" to the opinions of Dr. Caraceni and Dr. Hom—all non-treating physicians. However, the ALJ assigned "only some weight" to Dr. Carbone and Dr. Sampson, DDS examining physicians. Plaintiff has had two primary care physician, Dr. Alkabbani and Dr. Bem, who were treating physicians. The ALJ assigned "some weight" to Dr. Alkabbani's assessment and "little weight" to Dr. Bem's assessment. Finally, the ALJ assigned "little weight" to David Hamilton's psychological evaluation of Plaintiff. (A.R. 56–57.)

Four of the assessments could be classified as coming from treating sources: Dr. Comey, who performed Plaintiff's back surgery; Dr. Alkabbani; Dr. Bem; and David Hamilton, the clinician who performed the initial psychological evaluation and subsequent therapy. The opinions of treating physicians, if supported, are generally entitled to controlling weight. The remaining physicians only completed consultative evaluations. Their opinions, while not entitled to controlling weight, must nevertheless be taken into consideration in evaluating disability and given the weight that is appropriate in light of other evidence in the record.

Plaintiff's treating physicians described the severity of Plaintiff's left neck and arm symptoms, her mental health condition, and her ability to work since 2008. Dr. Comey evaluated Plaintiff twice and recommended surgery for her "severe left neck and arm symptoms." (A.R. 464) Plaintiff's examinations with Dr. Comey were limited by her pain but the review of her CT scan revealed "severe degenerative changes." (A.R. 465.) Dr. Comey, like most of the physicians who have evaluated Plaintiff, found her pleasant but he also noted that she was "tearful." (A.R. 465.)

Plaintiff's primary care physicians provided a compelling, and clinically supported, account of her limitations and conditions. While many of the agency evaluators considered either Plaintiff's physical or mental limitations, Drs. Alkabbani and Bem were responsible for all facets of her care and both noted her depression, anxiety, and chronic pain. The combination of Plaintiff's limitations undoubtedly contributed to their explicit finding that she was unable to work.

Dr. Alkabbani had treated Plaintiff at Baystate Medical Center (A.R. 470–72, 521–22; 523–24) and had completed the requested form. The ALJ assigned "some weight" to Dr. Alkabbani's opinion but noted that the assessment did not define the "functional limitations that claimant would have." (A.R. 54.) However, the state form that Dr. Alkabbani was asked to fill out never requested information on functional limitations. Dr. Alkabbani reported Plaintiff's diagnosis of chronic back pain and cervical disc herniation. Dr. Alkabbani also opined that Plaintiff's physical impair-

ment affected her ability to work and that impairment would last for more than a year. In routine assessments of Plaintiff, Dr. Alkabbani had diagnosed Plaintiff with chronic back pain and noted that when she was in the office Plaintiff appeared to be in pain, was limited in movement, and was unable even to stand straight. (A.R. 470–71, 522.) While Dr. Alkabbani did note that on one visit that Plaintiff "did not look in pain or distress" (A.R. 524), this finding was consistent with Plaintiff's testimony that she had good and bad days.

Dr. Bem provided the most detailed evaluation of Plaintiff's limitations on the Physical Residual Functional Capacity Questionnaire. On the form, Dr. Bem opined that Plaintiff would be absent more than four days a month and would have drastic limitations on her ability to carry out even basic tasks at work. Despite Dr. Bem's familiarity with Plaintiff, the ALJ gave his report "little weight" because: (1) it was inconsistent with the records; and (2) Dr. Bem had only been treating Plaintiff for four months at the time of the evaluation. Neither of these criticisms holds water.

First, Dr. Bem saw Plaintiff as much as any other physician. Dr. Alkabbani—who the ALJ assigned "some weight" to—saw Plaintiff three times in 2009. Dr. Bem also saw Plaintiff three times—in October 2010, December 2010, and January 2011. Dr. Bem was involved in finding a solution to Plaintiff's pain problems. In December 2010, Dr. Bem referred her to a sports medicine specialist and psychiatrist (A.R. 554–55, 556–57, 558–59) and prescribed pain medication. Dr. Bem had the opinions of these specialists as well as personal evaluations when he completed the Physi-

cal Residual Functional Capacity Questionnaire.

Dr. Bem's assessment also finds support throughout the record. As noted previously, each of Plaintiff's treating physicians noted the severity of her condition and the limitations placed on her due to those conditions. The testimony of Plaintiff and her sister also confirmed the reports of bad days as well as the need for frequent breaks. Rather than "little weight," the opinion of Dr. Bem should have been given the full weight generally afforded a treating physician.

Finally, there was also evidence that Plaintiff had mental limitations that seriously impaired her functioning. The ALJ gave "little weight" to the opinion of treating source David Hamilton at Liberty Street Counseling because: (1) the GAF score came from an initial visit; and (2) Plaintiff received limited treatment before discontinuing with Dr. Hamilton. This termination of treatment, the ALJ found, was evidence that the symptoms were not disabling. (A.R. 55.)

In fact, a GAF score was assigned to Plaintiff at each of her ten therapy visits. At eight sessions, Plaintiff was assigned a GAF score of 45. At the other two sessions, she was assigned a GAF score of 44. While Plaintiff did receive two GAF scores in the low 50s from evaluating, non-treating sources, she was consistently given a GAF score in the 40s by her treating source who saw her ten times over six months. The GAF score indicates that Plaintiff suffered serious impairment to her functioning.[4]

■ The ALJ also erred in drawing inferences from Plaintiff's decision to stop attending therapy. While Plaintiff did

---

4. Even the scores given by the evaluative sources indicated at least moderate impair-

ment to Plaintiff's functioning.

stop attending therapy, there is no indication in the record that she stopped attending because the symptoms were not disabling. Rather, as Plaintiff told other evaluators, she stopped attending because she did not find therapy helpful and her condition was not improving. (A.R. 483.) In the records from Liberty Street Counseling, Mr. Hamilton also noted a lack of progress in part due to alcohol dependence and transportation obstacles. (A.R. 463.) In sum, the record clearly indicates that Plaintiff's mental impairments were serious.

As the ALJ noted, there were some notes on the record that suggested that Plaintiff's chronic pain and depression did not impose sufficiently severe limitations to render her disabled. Plaintiff and her sister testified that Plaintiff could do some household tasks and make trips out several days a week. Plaintiff seemed to get some relief from Percocet. Plaintiff also seemed to fear or abandon some of the treatments recommended by her physicians and therapists.

However, Plaintiff's back surgery, her long history of chronic back and shoulder pain, her mental disabilities, and the fact that all four of Plaintiff's treating physicians noted the severity of her condition and the limitations that it imposed, constituted overwhelming evidence of disability. A fair review of this record reveals that, in light of this strong evidence, there simply was no "substantial" evidence supporting the ALJ's decision. The ALJ failed to give proper consideration and weight to the opinions of Dr. Comey, Dr. Alkabbani, Dr. Bem, and Liberty Street Counseling regarding Plaintiff's limitations. The reasons offered by the ALJ to brush aside these opinions simply cannot survive objective scrutiny. In light of this, the court will remand the case to a different ALJ for further consideration.

### D. Testimony of Vocational Expert.

Finally, Plaintiff also argues that the ALJ improperly relied on the vocational expert's testimony. To rely on the opinion of a vocational expert, "the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho v. Sec'y of Health and Human Servs.*, 670 F.2d 374, 375 (1982). "The Secretary may meet her burden of proving the existence of a substantial number of suitable jobs in the economy by relying upon an expert's answer to a hypothetical question, so long as the hypothetical itself corresponds to conclusions that are supported by substantial evidence in the record." *Mendez v. Sec'y of Health and Human Servs.*, 48 F.3d 1211 (Table) at *2 (1st Cir.1995).

At the hearing, the ALJ asked the vocational expert if Plaintiff would be able to do light work with manipulative limitations. The vocational expert responded that there would not be many jobs with those limitations except a booth cashier, information clerk in a mall or public building, and a ticket seller in a movie theater or public transportation facility.

The ALJ then asked the vocational expert which of those jobs could be performed if Plaintiff's chronic pain and depression incapacitated her for one-third of the day. The vocational expert opined that Plaintiff would not be able to perform *any* work that existed in the national or local economy under those conditions.

The ALJ relied on the vocational expert's opinion on a hypothetical that only included manipulative limitations. Clearly, the second hypothetical, which provided for incapacitation due to chronic pain and depression, was the appropriate analytical rubric. All of Plaintiff's treating physi-

cians noted that Plaintiff not only suffered from manipulative limitations but also incapacitation due to pain and depression. Additionally, the evaluation by Dr. Caraceni, a medical consultant for DDS, supported the second hypothetical. In her assessment, Plaintiff could only work for two-thirds of a work day due to neck pain. (A.R. 405.) She also felt that Plaintiff's symptoms were credible. (A.R. 407.) This opinion was confirmed by Dr. Hom. (A.R. 482.) There were no physicians who opined that Plaintiff could work a full day, even at light work with manipulative limitations.

The substantial evidence of the record demonstrated that an appropriate hypothetical should have focused on light work with manipulative limitations and incapacitation for at least one-third of a work day. When given that hypothetical, the vocational expert testified that there were no jobs in the local or national economy that an individual with those constraints could take. The ALJ erred in relying on a hypothetical unsupported by the record and failing to give proper weight to the opinion of the vocational expert when posed with the more appropriate hypothetical.

E. *Remedy.*

█ The record before the court provides strong evidence supporting an outright reversal of the Commissioner's determination. The court recognizes, however, that reversal is justified only in "unusual" cases where "the proof of disability is overwhelming" or "the proof is very strong and there is no contrary evidence." *Seavey v. Barnhart,* 276 F.3d 1, 11 (1st Cir.2001). Except in glaring cases, the better practice is for the court to remand the case for further proceedings to permit the Commissioner to resolve the factual issues and make an entitlement determination. *Id.; Freeman v. Barnhart,* 274 F.3d 606, 609 (1st Cir.2001) ("A remand is the proper remedy here because it would allow the Commissioner to fulfill his role of resolving conflicting evidence, a task which is not [the court's] to perform.").

Prudence suggests that this record, though powerful, may not present the compelling circumstances where outright reversal and a direct order awarding benefits is proper. In light of First Circuit authority and erring on the side of caution, the court will order the case remanded, with a condition.

Plaintiff has been waiting a very long time for a proper resolution of her claim. She first filed her application in May 2007, almost six years ago. With this in mind, the court will order the Assistant United States Attorney to report to the court every ninety days on the status of Plaintiff's application until the matter is resolved.

## IV. *CONCLUSION*

For the foregoing reasons, Plaintiff's Motion To Reverse the Decision of the Commissioner (Dkt. No. 8) is hereby ALLOWED, and Defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. No. 16) is hereby DENIED. The case is hereby remanded to the Commissioner for further proceedings consistent with this decision. The Commissioner is ordered to report to the court, through counsel, no later than May 27, 2013, as to the status of proceedings on remand, and every ninety days thereafter until this matter is fully resolved.

It is So Ordered.